JS44 (Rev. 03/99)

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose if initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| JOSEPH CAMMAROTA, A MINOR, BY AMY LYNN HALLOCK, GUARDIAN AND AMY LYNN HALLOCK, INDIVIDUALLY | 1. GlaxoSmithKline LLC, formerly SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK") |
| | COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT New Castle County, DE |
| (b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF Passaic County, NJ (EXCEPT IN U.S. PLAINTIFF CASES) | (IN U.S. PLAINTIFF CASES ONLY) NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED |

| (c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Adam D. Peavy, Esquire          Rosemary Pinto, Esquire<br>W. Harris Junell, Esquire       Feldman & Pinto<br>T. Scott Allen, Esquire         1604 Locust Street, FL 2R<br>Bailey Perrin Bailey            Philadelphia, PA 19103<br>440 Louisiana Street, Suite 2100  (215)546-4385<br>Houston, TX 77002<br>(713)425-7100 | Joseph E. O'Neil, Esquire<br>Christine O. Boyd, Esquire<br>Carolyn L. McCormack, Esquire<br>Lavin, O'Neil, Ricci, Cedrone & DiSipio<br>190 N. Independence Mall West, Suite 500<br>6th and Race Streets<br>Philadelphia, PA 19106<br>(215) 627-0303 |

| II. BASIS OF JURISDICTION (PLACE AN "X" IN ONE BOX ONLY) | III. CITIZENSHIP OF PRINCIPAL PARTIES (For Diversity Cases Only) | | | | (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE FOR DEFENDANT) | | |
|---|---|---|---|---|---|---|---|
| ☐ 1 U.S. Government Plaintiff    ☐ 3 Federal Question (U.S. Government Not a Party) | | PTF | DEF | | | PTF | DEF |
| | Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business in This State | | ☐ 4 | ☐ 4 |
| ☐ 2 U.S. Government Defendant    ☒ 4 Diversity (Indicate Citizenship of Parties in Item III) | Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business in Another State | | ☐ 5 | ☒ 5 |
| | Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | | ☐ 6 | ☐ 6 |

| IV.   NATURE OF SUIT | | (PLACE AN x IN ONE BOX ONLY) | | |
|---|---|---|---|---|
| **CONTRACT** | **TORTS** | | **FORFEITURE/PENALTY** | **BANKRUPTCY** | **OTHER STATUTES** |

**CONTRACT**
☐ 110 Insurance
☐ 120 Marine
☐ 130 Miller Act
☐ 140 Negotiable Instrument
☐ 150 Recovery of Overpayment & Enforcement of Judgment
☐ 151 Medicare Act
☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
☐ 153 Recovery of Overpayment of Veteran's Benefits
☐ 160 Stockholders Suits
☐ 190 Other Contract
☐ 195 Contract Product Liability

**TORTS**
PERSONAL INJURY
☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers' Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury

PERSONAL INJURY
☐ 362 Personal Injury – Med Malpractice
☒ 365 Personal Injury – Product Liability
☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**FORFEITURE/PENALTY**
☐ 610 Agriculture
☐ 620 Other Food & Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 R.R. & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**LABOR**
☐ 710 Fair Labor Standards Act
☐ 720 Labor/Mgmt. Relations
☐ 730 Labor/Mgmt. Reporting & Disclosure Act
☐ 740 Railway Labor Act
☐ 790 Other Labor Litigation
☐ 791 Empl. Ret. Inc. Security Act

**REAL PROPERTY**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**CIVIL RIGHTS**
☐ 441 Voting
☐ 442 Employment
☐ 443 Housing/Accommodations
☐ 444 Welfare
☐ 440 Other Civil Rights

**PRISONER PETITIONS**
☐ 510 Motions to Vacate Sentence
Habeas Corpus:
☐ 520 General
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Other

**BANKRUPTCY**
☐ 442 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**SOCIAL SECURITY**
☐ 861 HIA (1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g))
☐ 864 SSID Title XVI
☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
☐ 870 Taxes (U.S. Plaintiff or Defendant)
☐ 871 IRS – Third Party 26 USC 7609

**OTHER STATUTES**
☐ 400 State Reapportionment
☐ 410 Antitrust
☐ 430 Banks and Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation
☐ 470 Racketeer Influenced and Corrupt Organizations
☐ 810 Selective Service
☐ 850 Securities/Commodities Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 895 Freedom of Information Act
☐ 900 Appeal of Fee Determination Under Equal Access to Justice
☐ 950 Constitutionality of State Statutes
☐ 890 Other Statutory Actions

| V.   ORIGIN | | (PLACE AN x IN ONE BOX ONLY) | | | | | Appeal to District |
|---|---|---|---|---|---|---|---|
| ☐ 1 Original Proceeding | ☒ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from another district (specify) | ☐ 6 Multidistrict Litigation | ☐ 7 Judge from Magistrate Judgment | |

**VI.  CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)
Diversity case under 28. U.S.C. §1332, Plaintiff alleges injury as a result of use of pharmaceutical product manufactured by Defendant.

| VII. REQUESTED IN COMPLAINT: | CHECK IF THIS IS A ☐ UNDER F.R.C.P. 23 | **CLASS ACTION** | DEMAND $ From the injuries described in the Complaint, in excess of $75,000.00 | Check YES only if demanded in complaint: JURY DEMAND ☒ YES   ☐ NO |
|---|---|---|---|---|

| VIII. RELATED CASE(S) IF ANY    N/A | (See instructions): | | | |
|---|---|---|---|---|
| | | JUDGE | | DOCKET NUMBER |

| DATE   10/24/11 | SIGNATURE OR ATTORNEY OF RECORD | |
|---|---|---|
| | | JOSEPH E. O'NEIL ID No. 29053/ CAROLYN L. MCCORMACK ID No. 87800 |

| FOR OFFICE USE ONLY | | | | | |
|---|---|---|---|---|---|
| RECEIPT # | AMOUNT | APPLYING IFP | JUDGE | MAG. JUDGE | |

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA—DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignation to appropriate calendar.**

Address of Plaintiff: _____ 4 Almadera Drive, Wayne, NJ 07470 _____

Address of Defendant (GlaxoSmithKline): _____ 1105 North Market Street, Suite 1300, Wilmington, DE 19801 _____

Place of Accident, incident or Transaction: _____ Wayne, NJ _____
*(Use Reverse Side for Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more or more of its stock?

(attach two copies of the Disclosure Statement Form in accordance with the Fed.R.Civ.P.7.1.(a)   Yes ☐   No. ☒

Does this case involve multidistrict litigation possibilities?                    Yes ☐   No ☒

RELATED CASE IF ANY

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when "yes" is answered to any of the following questions:

1.  Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?                    Yes ☐    No ☒

2.  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?                    Yes ☐    No ☒

3.  Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?                    Yes ☐    No ☒

4.  Is this case a second or successive habeas corpus, social security appeal, or pro se civil case filed by the same individual?                    Yes ☐    No ☒

CIVIL: (Place ☒ in ONE CATEGORY ONLY)

| | A. *Federal Question Cases:* | | B. *Diversity Jurisdiction Cases:* |
|---|---|---|---|
| 1. ☐ | Indemnity Contract, Marine Contract, and All Other Contracts | 1. ☐ | Insurance Contract and Other Contracts |
| | | 2. ☐ | Airplane Personal Injury |
| 2. ☐ | FELA | 3. ☐ | Assault, Defamation |
| 3. ☐ | Jones Act—Personal Injury | 4. ☐ | Marine Personal Injury |
| 4. ☐ | Antitrust | 5. ☐ | Motor Vehicle Personal Injury |
| 5. ☐ | Patent | 6. ☐ | Other Personal Injury (Please specify): Negligence |
| 6. ☐ | Labor-Management Relations | 7. ☒ | Products Liability |
| 7. ☐ | Civil Rights | 8. ☐ | Products Liability—Asbestos |
| 8. ☐ | Habeas Corpus | 9. ☐ | All other Diversity Cases |
| 9. ☐ | Securities Act(s) Cases | | (Please specify) |
| 10. ☐ | Social Security Review Cases | | |
| 11. ☐ | All other Federal Question Cases | | |
| | (Please specify _____ ) | | |

**ARBITRATION CERTIFICATION**
*(Check appropriate category)*

I, _____ Joseph E. O'Neil, Esquire _____ counsel of record, do hereby certify:

☒  Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that, to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000 exclusive of interest and cost;

☐  Relief other than monetary damages is sought.

DATE: 10/24/11 _____ 29053
                JOSEPH E. O'NEIL            *Attorney-at-Law*            *Attorney ID#*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 10/24/11 _____ 29053
                JOSEPH E. O'NEIL            *Attorney-at-Law*            *Attorney ID#*

**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF PENNSYLVANIA—DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignation to appropriate calendar.**

Address of Plaintiff: _4 Almadera Drive, Wayne, NJ 07470_

Address of Defendant (GlaxoSmithKline): _1105 North Market Street, Suite 1300, Wilmington, DE 19801_

Place of Accident, incident or Transaction: _Wayne, NJ_
*(Use Reverse Side for Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more or more of its stock?

(attach two copies of the Disclosure Statement Form in accordance with the Fed.R.Civ.P.7.1.(a)   Yes ☐   No. ☒

Does this case involve multidistrict litigation possibilities?    Yes ☐   No ☒

RELATED CASE IF ANY

Case Number: _____  Judge: _____  Date Terminated: _____

Civil cases are deemed related when "yes" is answered to any of the following questions:

1.  Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?    Yes ☐   No ☒

2.  Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?    Yes ☐   No ☒

3.  Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?    Yes ☐   No ☒

4.  Is this case a second or successive habeas corpus, social security appeal, or pro se civil case filed by the same individual?    Yes ☐   No ☒

CIVIL: (Place ☒ in ONE CATEGORY ONLY)

A.  *Federal Question Cases:*

1.  ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2.  ☐ FELA
3.  ☐ Jones Act—Personal Injury
4.  ☐ Antitrust
5.  ☐ Patent
6.  ☐ Labor-Management Relations
7.  ☐ Civil Rights
8.  ☐ Habeas Corpus
9.  ☐ Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases
    (Please specify _____ )

B.  *Diversity Jurisdiction Cases:*

1.  ☐ Insurance Contract and Other Contracts
2.  ☐ Airplane Personal Injury
3.  ☐ Assault, Defamation
4.  ☐ Marine Personal Injury
5.  ☐ Motor Vehicle Personal Injury
6.  ☐ Other Personal Injury (Please specify): Negligence
7.  ☒ Products Liability
8.  ☐ Products Liability—Asbestos
9.  ☐ All other Diversity Cases
    (Please specify)

**ARBITRATION CERTIFICATION**

*(Check appropriate category)*

I, _Joseph E. O'Neil, Esquire_  counsel of record, do hereby certify:

☒ Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that, to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000 exclusive of interest and cost;

☐ Relief other than monetary damages is sought.

DATE: 10/24/11   _____  29053
JOSEPH E. O'NEIL         *Attorney-at-Law*         *Attorney ID#*

**NOTE:**  A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 10/24/11   _____  29053
JOSEPH E. O'NEIL         *Attorney-at-Law*         *Attorney ID#*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | |
|---|---|
| JOSEPH CAMMAROTA, a Minor, by AMY LYNN HALLOCK, GUARDIAN, and AMY LYNN HALLOCK, Individually<br><br>       Plaintiffs<br><br>  v.<br>SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE<br><br>       Defendant | No. |

   In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a case management track designation form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS

(a) Habeas Corpus – Cases brought under 28 U.S.C. §2241 through §2255. ☐

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ☐

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ☐

(d) Asbestos—Cases involving claims for personal injury or property damage from exposure to asbestos. ☐

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ☐

(f) Standard Management – Cases that do not fall into any one of the other tracks. ☒

_10/24/11_
Date

_Joseph E. O'Neil_
Joseph E. O'Neil, Esquire
Carolyn L. McCormack, Esquire

GlaxoSmithKline LLC formerly SmithKline Beecham Corporation, d/b/a GlaxoSmithKline ("GSK")
Attorney for Defendant

(215) 627-0303
Telephone

(215) 627-2551
Fax Number

joneil@lavin-law.com
cmccormack@lavin-law.com
E-mail Address

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JOSEPH CAMMAROTA, a Minor, by** : | |
| **AMY LYNN HALLOCK, Guardian, and** : | |
| **AMY LYNN HALLOCK, Individually,** : | |
| : | |
| **Plaintiffs,** : | |
| : | |
| **vs.** : | **Civil Action No.:** |
| : | |
| **SMITHKLINE BEECHAM** : | |
| **CORPORATION d/b/a** : | |
| **GLAXOSMITHKLINE** : | |
| : | |
| **Defendant.** : | |
| : | |
| : | |

### NOTICE OF REMOVAL

Defendant GlaxoSmithKline LLC, formerly SmithKline Beecham Corporation d/b/a

GlaxoSmithKline ("GSK"), named defendant in the above-captioned matter, pursuant to 28

U.S.C. §§ 1441 and 1446, hereby removes this case from the Court of Common Pleas of

Philadelphia County, Pennsylvania, to the United States District Court for the Eastern District of

Pennsylvania, respectfully showing as follows:

1.

On or about September 30, 2011, Plaintiffs Joseph Cammarota and Amy Lynn Hallock

("Plaintiffs") filed a Civil Action Short-Form Complaint ("Short-Form Complaint") in the

consolidated Paxil Pregnancy litigation before the Honorable Sandra Mazer Moss in the

Philadelphia Court of Common Pleas Mass Tort Program, In re Paxil Pregnancy Cases, February

Term 2007, No. 3220 ("Paxil Pregnancy MTP").[1]

---

[1] Pursuant to Case Management Order No. 1 in the Paxil Pregnancy MTP, all newly filed cases in the Philadelphia Court of Common Pleas are initiated by the filing of a Short-Form Complaint, which incorporates by reference the Plaintiffs' General Master Long-Form Complaint ("Long-Form Complaint"), filed on March 7, 2007. (See Long-Form Complaint, ¶ 1) (attached as Exhibit A).

2.

Plaintiffs' Short-Form Complaint initiated the civil action styled Joseph Cammarota, a Minor, by Amy Lynn Hallock, Guardian and Amy Lynn Hallock, Individually v. SmithKline Beecham Corporation d/b/a GlaxoSmithKline, September Term 2011, No. 003694.

3.

GSK was served with Plaintiffs' Short-Form Complaint on October 19, 2011.

4.

Accordingly, this Notice is timely as it was filed within thirty (30) days after service of the Short-Form Complaint that initiated Plaintiffs' lawsuit against GSK and within one year of the filing of the Short-Form Complaint.

5.

Pursuant to 28 U.S.C. § 1446(a), a true and correct copy of all process, pleadings, and accompanying documents served on GSK are attached hereto as Exhibit "B," which is incorporated herein by reference.

6.

The Short-Form Complaint asserts claims predicated on Amy Lynn Hallock's alleged use of Paxil®, paroxetine hydrochloride ("Paxil"), a prescription medication manufactured by GSK and approved by the United States Food and Drug Administration ("FDA").

7.

By filing this Notice of Removal, GSK does not waive any jurisdictional or other defenses that might be available to it.

2

8.

As explained below, this Court has original subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332, and the action may be removed to this Court under 28 U.S.C. §1441 because there is complete diversity of citizenship between Plaintiffs and GSK, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

## DIVERSITY OF CITIZENSHIP

9.

On October 27, 2009, SmithKline Beecham Corporation ("SKB"), a Pennsylvania corporation, converted into GlaxoSmithKline LLC, a limited liability company organized under Delaware law.

10.

In order to clarify its status in Pennsylvania (i.e., no longer having the status as a Pennsylvania corporation), SKB filed modified articles of dissolution with the Pennsylvania Department of State pursuant to 15 Pa. Cons. § 1980.[2]

11.

The articles of dissolution terminated SKB's status as a domestic business corporation under Pennsylvania law, and the entity continued to exist as GlaxoSmithKline LLC under Delaware law. As the successor entity, GlaxoSmithKline LLC succeeded to liability of SKB.

---

[2] As explained in the official commentary to Section 1980, this filing did not cause an actual dissolution of SKB, but rather simply confirmed its change in status: "This section [1980] is intended to provide a procedure under which a domestic business corporation that has domesticated itself under the laws of another jurisdiction can clarify its status in Pennsylvania. . . . The effect of filing under this section is not to dissolve the corporation in the ordinary sense but simply to terminate its status as a domestic business corporation. The existence of the corporation is not affected because the same entity continues to exist in the new jurisdiction of incorporation." As such, SKB's articles of dissolution noted, "SmithKline Beecham Corporation is being domesticated to Delaware and subsequently converted to a Delaware Limited Liability Company under Delaware and Pennsylvania law."

3

12.

For purposes of diversity jurisdiction, the citizenship of an LLC is that of its members.

Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 420 (3d Cir. 2010).

13.

The sole member of GSK is GlaxoSmithKline Holdings (Americas) Inc. ("GSK

Holdings"). GSK Holdings is a Delaware corporation with its principal place of business in

Wilmington, Delaware. White v. SmithKline Beecham Corp., 2:10-cv-2241, 2010 U.S. Dist.

LEXIS 79520, *8-9 (E.D. Pa. Aug. 5, 2010) (holding that GSK is a citizen of Delaware because

GSK Holdings is a Delaware corporation whose principal place of business is located in

Delaware, and denying plaintiff's motion to remand the action brought against GSK in the

Philadelphia Court of Common Pleas); Hoch v. Eli Lilly & Co., 736 F. Supp. 2d 219, 221

(D.D.C. 2010) (concluding that GSK is a citizen of Delaware); but cf. Brewer v. SmithKline

Beecham Corp., 774 F. Supp. 2d 720, 732 (E.D. Pa. 2011) (concluding on the basis of an

expanded record that GSK is a citizen of Pennsylvania).[3]

---

[3] Prior to the White decision, another court in this District reached a contrary result. See Monroe v. SmithKline Beecham Corp., 2:10-cv-2140, 2010 U.S. Dist. LEXIS 63626 (E.D. Pa. June 23, 2010). GSK requested that the Monroe court reconsider and vacate its Order, as it was signed five days before GSK's response was due -- without the benefit of GSK's opposition papers. The court has since recognized that the case was improperly remanded because Plaintiff's Motion to Remand was untimely filed. See Monroe, 2:10-cv-2140, slip op. at 1 (July 20, 2010) (attached as Exhibit C.) The Monroe court's now-vacated remand order should have no authoritative value in this case.

Additionally, on July 19, 2011, Judge Joel H. Slomsky granted plaintiffs' motions to remand in Cole v. SmithKline Beecham Corp. d/b/a GlaxoSmithKline (Civil Action No. 2:11-cv-04079) and Torres v. SmithKline Beecham Corp. d/b/a GlaxoSmithKline (Civil Action No. 2:11-cv-04083). Both Orders followed Judge Savage's ruling in Brewer, but provided no additional reasoning. Because Judge Slomsky's orders came before GSK's brief in opposition to the motions for remand had been due, and therefore were made without the benefit of GSK's brief, GSK filed Motions for Relief from the orders in both cases. The Motions for Relief in Cole and Torres are currently pending, and in the meanwhile, the files for those cases have not yet been transferred to state court. On September 27, 2011, Judge Slomsky entered a similar order granting remand in Herman v. SmithKline Beecham Corp. d/b/a GlaxoSmithKline (Civil Action No. 11-5968 (JHS)), also before GSK's deadline for responding to the remand motion had arrived and also without the benefit of GSK's briefing (and an expanded record). (See Slomsky Order, Attached as Exhibit E) GSK has filed a Motion for Relief in that case as well. Like the Motions for Relief in the other two cases, the Motion for Relief in Herman remains pending, and the file in Herman has not been transferred to state court.

4

14.

GSK LLC respectfully submits that Brewer was incorrectly decided because the Brewer court announced a new rule that cannot be reconciled with Supreme Court and Third Circuit precedent, based in part on a factual record that was silent regarding certain features of limited liability companies in general and GSK in particular. Judge Timothy J. Savage, who decided Brewer, permitted GSK to address these issues through additional briefing and additional jurisdictional discovery in twenty-eight cases that are currently consolidated before him for consideration of Motions to Remand. As a result of this additional jurisdictional discovery, the record on the remand issue has now been expanded beyond that which was before the Brewer court, with new deposition testimony, declarations, and documents, all of which is currently under consideration by Judge Savage and has yet to be considered by this Court. In light of this expanded record, Judge Savage heard oral argument on the Motions to Remand on September 8, 2011, and he has not yet issued a decision.[4]

15.

GSK respectfully submits that removal is proper. In Hertz Corp. v. Friend -- which, like Zambelli, was decided after GSK converted into a Delaware LLC, and therefore had no bearing on GSK's corporate changes -- the Supreme Court announced a simple, easily applied jurisdictional test for determining a corporation's "principal place of business". See Hertz, 130 S. Ct. 1181, 1193 (2010) (discussing simplicity and predictability as admirable traits in a jurisdictional rule). In Brewer, the court applied a novel, complex test based on an incorrect premise -- namely, that GSK Holdings had "delegated" to the LLC's officers and directors its

---

[4] See Maldonado v. GlaxoSmithKline, No. 2:11-cv-02812, Docket No. 24 (E.D. Pa. May 27, 2011) (omnibus opposition to Plaintiffs' Motion to Remand) (attached as Exhibit D).

right to manage and control the business of GSK LLC. <u>Brewer</u>, 774 F. Supp. 2d at 728-729.[5] GSK submits that removal here is proper under application of the controlling authority announced in <u>Hertz</u> and <u>Zambelli</u>. GSK further submits that <u>Brewer</u> should not be followed, that it is not controlling precedent, and that the reasoning in <u>White</u> should be followed even in light of the expanded record in the <u>Brewer</u> and other post-<u>Brewer</u> cases.

16.

Under the well-settled test for LLC citizenship, the <u>Brewer</u> court should have looked solely to the citizenship of the LLC's member, GSK Holdings, not to the nerve center of the LLC itself. The <u>Brewer</u> court also disregarded the corporate form without any justification for "piercing the corporate veil" and failed to base its citizenship determination on the entity in question, even though corporate formalities had been maintained. Further, to the extent the <u>Brewer</u> court purported to apply an unmodified "nerve center" test to GSK Holdings, it did not faithfully apply <u>Hertz</u>. Instead of trying to identify the place from which the directors and officers actually direct and control the activities of GSK Holdings, the court focused on post-removal conduct and business activities that have no relevance under <u>Hertz</u>'s nerve center test. (<u>See generally</u> Exhibit D, GSK's Opposition to Plaintiffs' Motion to Remand) (responding to <u>Brewer</u> opinion and further explaining why GSK is a citizen of Delaware under well-settled law).)

---

[5] GSK was *formed* as a manager-managed LLC by its operating agreement pursuant to Delaware law. Del. Code Ann. tit. 6, § 18-402. That law contemplates this structure and states that if an LLC agreement "provides for the management . . . of a [LLC] by a manager, *the management of the [LLC],* to the extent so provided, *shall be vested in the manager*." Id. (emphasis added). Thus, under Section 18-402, the original authority to manage GSK was *vested in the managers of GSK.* GSK Holdings, as the member of a manager-managed LLC, did not have the authority to manage the LLC, but instead, had the right to appoint and remove GSK's managers. Because GSK Holdings did not have the right to manage GSK's business, it could not have *delegated* that right.

6

17.

GSK Holdings is a holding company, not an operating company. GSK Holdings' nerve center is located in Wilmington, Delaware, because its limited activities as a holding company are directed, controlled, and coordinated at meetings of its board of directors in Wilmington. See White, 2010 U.S. Dist. LEXIS 79520, at *8-9; Hoch, 736 F. Supp. 2d at 221. Because GSK Holdings is a Delaware corporation with its principal place of business located in Delaware, GSK Holdings is a citizen of Delaware. Because GSK Holdings is a citizen of Delaware, so too is GSK.

18.

GSK is a citizen of Delaware and was not at the time of the commencement of this action or at any time thereafter a citizen of the State of New Jersey.

19.

At the time this action was commenced, Plaintiffs were citizens and residents of the State of New Jersey. (Short-Form Complaint, ¶ 2.)

20.

Therefore, complete diversity of citizenship exists between Plaintiffs and Defendant GSK.

## RESIDENT-DEFENDANT RULE

21.

Removal of this action is not barred by the resident-defendant rule set forth in 28 U.S.C. § 1441(b) because GSK is not a citizen of Pennsylvania (the state in which this action was brought), but rather is a citizen of Delaware.

7

## AMOUNT-IN-CONTROVERSY

22.

Plaintiffs assert claims against GSK under the following fifteen (15) theories: (1) breach of express warranty; (2) breach of implied warranty; (3) fraud; (4) intentional infliction of emotional distress; (5) loss of consortium; (6) negligence; (7) negligence *per se*; (8) negligent pharmacovigilance; (9) failure to warn; (10) negligent misrepresentation; (11) punitive damages; (12) strict products liability; (13) loss of income; (14) medical expenses; and (15) design defect. Each cause of action seeks damages for injuries allegedly caused by ingestion of Paxil. (Short-Form Complaint, ¶ 7.)

23.

The Short-Form Complaint alleges that Plaintiff Amy Lynn Hallock took Paxil while she was pregnant with Plaintiff Joseph Cammarota. (See Short-Form Complaint, ¶ 3.)

24.

The Plaintiffs allege that Plaintiff Amy Lynn Hallock's ingestion of Paxil caused Plaintiff Joseph Cammarota to be born with total anomalous pulmonary vein return, pulmonary hypertension, and Paxil withdrawal. (See Short-Form Complaint, ¶ 5.)

25.

Plaintiffs allege that as a direct and proximate result of Plaintiff Amy Lynn Hallock's ingestion of Paxil, Plaintiff Joseph Cammarota suffered and will continue to suffer physical injury and has sustained economic damages, including medical expenses, loss of earnings and earning capacity, loss of enjoyment of life, and shortened life expectancy. (See Long-Form Complaint, ¶¶ 103-05, 110).

26.

Plaintiffs further allege that Plaintiff Joseph Cammarota has and continues to suffer economic damage in the form of pain and suffering, mental anguish, embarrassment and humiliation, disfigurement, and permanent and ongoing psychological damage. (See id. at ¶¶ 103-05, 107-09.) According to the Third Circuit Court of Appeals, "in personal injuries litigation the intangible factor of 'pain, suffering, and inconvenience' constitutes the largest single item of recovery, exceeding by far the out-of-pocket 'specials' of medical expenses and loss of wages." Nelson v. Keefer, 451 F.2d 289, 294 (3d Cir. 1971), quoted in Ciancaglione v. Sutherlin, No. Civ.A.04-CV-2249, 2004 WL 2040342, *3 (E.D. Pa. Sept. 13, 2004).

27.

Plaintiffs allege that GSK's actions were "performed willfully, intentionally, and with reckless disregard for the rights of Plaintiffs and the public" such that they are entitled to punitive or exemplary damages. (Id. at ¶ 114-15; see Short-Form Complaint, ¶ 7.)

28.

Plaintiffs selected "More than $50,000" as the amount-in-controversy on the Civil Cover Sheet filed with their Short-Form Complaint. Where a complaint does not limit its request to a precise monetary amount, the district court makes "an independent appraisal of the value of the claim." Angus v. Shiley, Inc., 989 F.2d 142, 146 (3d Cir. 1993). In such a case, the party seeking removal need only demonstrate by a preponderance of the evidence that the amount-in-controversy exceeds $75,000.00. Frederico v. Home Depot, 507 F.3d 188, 194-96 (3d Cir. 2007). The amount-in-controversy may be evidenced by demonstrating that the claims, as asserted in the plaintiff's complaint, are likely above the jurisdictional minimum. See id. at 197.

29.

Claims similar to those asserted by Plaintiffs have been held to establish, on their face, that the amount-in-controversy exceeds the jurisdictional requirement. See, e.g., Masterson v. Apotex Corp., 07-61665-CIV, 2008 WL 2047979, *3 (S.D. Fla. May 13, 2008) (in case alleging birth defects caused by generic paroxetine, court concluded that sufficient evidence existed that the amount-in-controversy exceeded $75,000 based upon allegations in complaint of congenital birth defects and "pain and suffering, mental anguish, embarrassment, humiliation, disfigurement, loss of enjoyment of the pleasure of life, as well as past and future general and specific damages, including future medical care" arising from the birth defects); Phillips v. Severn Trent Envtl. Servs., Inc., No. 07-3889, 2007 WL 2757131, *2 (E.D. La. Sept. 19, 2007) (amount-in-controversy requirement of $5 million, per CAFA, met in class action based upon size of class and "categories of serious damages", including birth defects, mental anguish, and present and future medical expenses); see also Varzally v. Sears, Robuck & Co., 09-CV-6137, 2010 WL 3212482, *2 (E.D. Pa. July 30, 2010) (allegations in product liability complaint met amount-in-controversy requirement because a "reasonable reading of plaintiff's claims suggests that he could recover in excess of $75,000 for damages sustained as a result of ongoing 'medical problems'").

30.

In other cases involving allegations of congenital defects, juries in Pennsylvania and other jurisdictions nationwide have awarded plaintiffs in excess of $75,000 in damages. See, e.g., White v. Behlke, No. 03 CV 2663 (Pa. Com. Pl., 45th Judicial Dist., Lackawanna Co. Nov. 17, 2008) (awarding $20.5 million in damages for birth defects caused by defendant doctor's malpractice); see also Estrada v. Univ. of South Fla. Board of Trustees, No. 06-CA-000625 (Fla.

10

Cir., Hillsborough Co. July 23, 2007) (awarding $23.55 million in damages as a result of a doctor's malpractice that resulted in plaintiff's child being born with birth defects); McCarell v. Hoffman-LaRoche Inc., No. ATL-L-1951-03-MT (N.J. Super., Atlantic Co., May 29, 2007) (awarding $2.619 million as a result of the defendant manufacturer's alleged failure to adequately warn about the risk of birth defects associated with its acne drug); Lindstrom v. Han, No. 1994-L-013821 (Ill. Cir., Cook Cnty. March 20, 2000) (awarding $4,502,312 verdict for doctor's negligent treatment of plaintiff during the first trimester of pregnancy, which caused child to be born with a birth defect); Tobin v. Astra Pharmaceutical, Inc., No. 88-0350-L(CS) (D. Ky. March 8, 1991) (awarding $4,508,399 to compensate plaintiff for congestive heart failure and heart transplant allegedly caused by use of defendant's prescription medication during pregnancy).

31.

Given the nature and extent of Plaintiffs' injuries and damages as alleged in the Short-Form Complaint, the amount-in-controversy exceeds $75,000.00, exclusive of interests and costs. See Angus, 989 F.2d at 146 ("[T]he amount in controversy is not measured by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated."); State Farm Mut., Auto. Ins. Co. v. Tz'doko V'CHESED of Klausenberg, 543 F. Supp. 2d 424, 432 n.5 (E.D. Pa. 2008) (same).

## PROPRIETY OF REMOVAL

32.

This Court has jurisdiction over this matter based on diversity of citizenship pursuant to 28 U.S.C. § 1332. Removal of this action to this Court is not barred by the resident-defendant rule set forth in 28 U.S.C. § 1441(b), as GSK is not a citizen of Pennsylvania.

11

33.

The United States District Court for the Eastern District of Pennsylvania is the federal judicial district encompassing the Court of Common Pleas of Philadelphia County, Pennsylvania, where Plaintiffs originally filed this suit such that this is the proper federal district for removal of this case to federal court. See 28 U.S.C. § 1441(a).

34.

Accordingly, the present lawsuit may be removed from the Court of Common Pleas of Philadelphia County, Pennsylvania, and brought before the United States District Court for the Eastern District of Pennsylvania, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446.

35.

Pursuant to 28 U.S.C. § 1446(d), GSK will promptly file a copy of this Notice of Removal with the Prothonotary of the Court of Common Pleas of Philadelphia County, Pennsylvania, and will serve a copy of same upon counsel for Plaintiff.

36.

GSK reserves the right to amend or supplement this Notice of Removal.

WHEREFORE, GSK prays that this Notice of Removal be filed; that said action bearing

docket number September Term 2011, No. 003694, from the Court of Common Pleas of

Philadelphia County, Pennsylvania, be removed to and proceed in this Court; and that no further

proceedings be had in said case in the Court of Common Pleas of Philadelphia County,

Pennsylvania.

This 24th day of October, 2011.

Respectfully Submitted,

LAVIN, O'NEIL, RICCI, CEDRONE & DISIPIO

By:     /s/Joseph E. O'Neil
        Joseph E. O'Neil, Esq. (ID No. 29053)
        Christine O. Boyd, Esq. (ID No. 28232)
        Carolyn L. McCormack, Esq. (ID No. 87800)
        190 N. Independence Mall West
        6th and Race Streets, Suite 500
        Philadelphia, PA 19106
        (215) 627-0303
        (215) 627-2551 (facsimile)

        Counsel for Defendant, GlaxoSmithKline
        formerly SmithKline Beecham Corporation
        d/b/a GlaxoSmithKline

13

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the foregoing **NOTICE OF**

**REMOVAL** by depositing a copy of the same in the U.S. Mail, first-class, postage prepaid, and

addressed as follows:

BAILEY PERRIN BAILEY
Adam D. Peavy, Esq.
W. Harris Junell, Esq.
T. Scott Allen, Esq.
400 Louisiana Street, Suite 2100
Houston, TX 77002

FELDMAN & PINTO
Rosemary Pinto, Esquire
1604 Locust Street, 2R
Philadelphia, PA 19103

**Counsel for Plaintiffs**

This 24th day of October, 2011.

*/s/Carolyn L. McCormack*
Carolyn L. McCormack

# Exhibit A

03/07/07   17:35 FAX 215 751 5139          GlaxoSmithKline Legal     → KAREN KARPINSKI          ☐001

HAND SERVED Lobby
march 7, 2007
B. Weber

003220

Court of Common Pleas of Philadelphia County
Trial Division
# Civil Cover Sheet

| PLAINTIFF'S NAME | DEFENDANT'S NAME |
|---|---|
| IN RE: PAXIL PREGNANCY CASES | SmithKline Beecham Corporation |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| | One Franklin Plaza |
| | Philadelphia          PA          19102-1226 |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |
| PLAINTIFF'S NAME | DEFENDANT'S NAME |
| PLAINTIFF'S ADDRESS | DEFENDANT'S ADDRESS |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NO. OF DEFENDANTS | COMMENCEMENT OF ACTION | | |
|---|---|---|---|---|
| | 1 | ☑ Complaint   ☐ Petition Action   ☐ Notice of Appeal | | |
| | | ☐ Writ of Summons   ☐ Transfer From Other Jurisdiction | | |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | | |
|---|---|---|---|---|
| ☐ $50,000.00 or less | ☐ Arbitration | ☑ Mass Tort | ☐ Commerce | ☐ Settlement |
| ☑ More than $50,000.00 | ☑ Jury | ☐ Savings Action | ☐ Minor Court Appeal | ☐ Minors |
| | ☐ Non-Jury | ☐ Petition | ☐ Statutory Appeals | ☐ W/D/Survival |
| | ☐ Other | | | |

CASE TYPE AND CODE (SEE INSTRUCTIONS)

    PxM MTP TK

STATUTORY BASIS FOR CAUSE OF ACTION (SEE INSTRUCTIONS)

None

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | | IS CASE SUBJECT TO COORDINATION ORDER? | |
|---|---|---|---|
| | | Yes | No |
| February 2007 Master Docket No. 3220 | | ☐ | ☐ |
| | | ☐ | ☐ |
| | | ☐ | ☐ |

## TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant:

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY | ADDRESS AND PHONE NUMBER |
|---|---|
| Cara J. Luther, Esq. (Bean Nelson, APC) | 1600 Market Street, 12th Floor, East Tower |
| PHONE NUMBER          FAX NUMBER | Philadelphia          PA          19102-2167 |
| (215) 665-5690          (215) 665-8225 | |
| SUPREME COURT IDENTIFICATION NO. | E-MAIL ADDRESS |
| 62565 | cluther@beasleyallen.com |
| SIGNATURE | DATE |
| *Cara J. Luther* | March 6, 2007 |

Ronald L.M. Goldman, Esq.
Karen Barth Menzies, Esq.
Jennifer R. Liakos, Esq.
Baum + Hedlund, A Professional Corporation
12100 Wilshire Blvd., Suite 950
Los Angeles, California 90025
Telephone: 310.207.3233
Facsimile: 310.207.4204

**ATTEST**

MAR   7 2007

Cara J. Luther, Esq. (52545)
Baum + Hedlund, A Professional Corporation
1500 Market Street, 12ᵗʰ Floor, East Tower
Philadelphia, Pennsylvania 19102
Telephone: 215.665.5659
Facsimile: 215.569.8228

M. SIMMONS
PRO. PROTHY

This is not an arbitration matter.
Assessment of damages hearing is
required

*Attorneys for Plaintiffs*

|  |  |
|---|---|
| IN RE: PAXIL PREGNANCY CASES | **COURT OF COMMON PLEAS** |
|  | **TRIAL DIVISION** |
|  | **OF PHILADELPHIA COUNTY** |
|  |  |
|  | **FEBRUARY TERM, 2007** |
|  |  |
|  | **MASTER DOCKET NO. 3220** |
|  |  |
|  | **JURY TRIAL DEMANDED** |

**Notice To Defend**

**NOTICE**

YOU HAVE BEEN SUED IN COURT. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Referral and Information Service
Philadelphia Bar Association
1101 Market Street – 11ᵗʰ Floor
Philadelphia, PA 19107
(215) 238-1701

**AVISO**

USTED HA SIDO DEMANDANDA EN LA CORTE. Si usted desea defender contra las demandas puestas en las siguientes páginas, usted tiene que tomar acción dentro de veinte (20) días después que esta demanda y aviso estén servidas, entablando un aparecimiento escrito o por un abogado y archivando por escrito con la Corte sus defensas o objeciones a las demandas puestas en contra usted. Usted se advertido que si falla de hacerlo el caso puede proceder sin usted y y un sentencia puede ser entrada contra usted por la Corte sin más aviso por cualquier dinero reclamada en la Demanda o por cualquier otro reclamo o alivio solicitado por el Demandante. Usted puede perder dinero o propiedad o otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VEA EN PERSONA OR LLAME POR TELEFONO A LA OFICINA CUYA DIRECCIÓN SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACIÓN DE LICENCIADOS DE FILADELFIA
SERVICIO DE REFERENCIA E INFORMACIÓN LEGAL
1101 Market Street – 11ᵗʰ floor
Philadelphia, PA 19107
(215) 238-1701

03/07/07   17:36 FAX 215 751 5139          GlaxoSmithKline Legal      → KAREN KARPINSKI          ☑003

Ronald L.M. Goldman, Esq.
rgoldman@baumhedlundlaw.com
Karen Barth Menzies, Esq.
kbmenzies@baumhedlundlaw.com
Jennifer R. Liakos, Esq.
Jliakos@baumhedlundlaw.com
Baum • Hedlund, A Professional Corporation
12100 Wilshire Blvd., Suite 950
Los Angeles, California 90025
Telephone:  310.207.3233
Facsimile:  310.207.4204

Cara J. Luther, Esq.
cluther@baumhedlundlaw.com
Attorney ID # 52545
Baum • Hedlund, A Professional Corporation
1500 Market Street, 12th Floor, East Tower
Philadelphia, Pennsylvania 19102
Telephone: 215.665.5659
Facsimile: 215.569.8228

Attorneys for Plaintiffs

COURT OF COMMON PLEAS
PHILADELPHIA COUNTY

IN RE: PAXIL PREGNANCY CASES

FEBRUARY TERM, 2007

MASTER DOCKET NO.: 3220

PLAINTIFFS' GENERAL
MASTER LONG-FORM
COMPLAINT, AND JURY
DEMAND

Pursuant to an Order by the Honorable Paul P. Panepinto, the undersigned attorneys for

plaintiffs in the "Paxil Pregnancy" actions bring this Master General Long-Form Complaint against

the defendant, SmithKline Beecham Corporation d/b/a/ GlaxoSmithKline (hereinafter "GSK").

## PLAINTIFFS

1.     Pursuant to the Order of this Court, this Complaint is a Master Complaint filed for

all plaintiffs in the "Paxil Pregnancy Cases." All allegations pleaded herein are deemed pleaded in

any "Short-Form" Complaint hereafter filed.

2.     The "Infant Plaintiffs" or "Decedents" referred to herein are minor children who were born with congenital birth defects, heart defects, PPHN and/or other related conditions or who suffered from various pulmonary disorders as a result of their mothers, ("Mother Plaintiffs") taking Paxil during their pregnancies. The Infant Plaintiffs are represented in these actions by their parents, ("Parent Plaintiffs") who are their next of friend pursuant to Pa. R.C.P. No 2026.

3.     The "Mother Plaintiffs" referred to herein are competent adults and the mothers of the Infant Plaintiffs or Decedents in these actions.  They bring these actions individually and on behalf of their minor children or as the Personal Representative of the estate of their deceased infant children to recover medical and other expenses related to treatment resulting from their child's birth defect, disorder and/or related illnesses and general and special damages.

4.     The "Father Plaintiffs" referred to herein are competent adults and the fathers of the Infant Plaintiffs or Decedents in these actions.  They bring these actions individually and on behalf of their minor children or as the Personal Representative of the estate of their deceased infant children to recover medical and other expenses relating to treatment resulting from their child's birth defect, disorder and/or related illnesses and general and special damages.

5.     "Plaintiffs" as used herein refers to the Infant Plaintiffs, Mother Plaintiffs and Father Plaintiffs collectively.

## DEFENDANT

6.     Defendant GSK was and still is a corporation duly existing under and by virtue of the laws of the State of Pennsylvania with its principal place of business in Philadelphia, Pennsylvania. At all times, defendant GSK was, and still is, a pharmaceutical company involved in research, development, testing, manufacture, production, promotion, distribution, and marketing of pharmaceuticals for distribution, sale, and use by the general public throughout the United States, including the drug Paxil (known generically as paroxetine), an antidepressant.

2

## JURISDICTIONAL ALLEGATIONS

7.      Jurisdiction is proper because GSK is a Pennsylvania corporation.  Venue is proper

in this District because GSK resides in this county for venue purposes and a substantial part of the

events and omissions giving rise to Plaintiffs' injuries occurred in this District.  *See* Pa.R.C.P. 2179,

as amended by 2003 Pennsylvania Court Order 8.

## GENERAL ALLEGATIONS

8.      The drug "paroxetine" is manufactured, promoted, distributed, labeled and marketed

by GSK under the trade name Paxil, Paxil Oral Suspension, and Paxil CR (hereinafter "Paxil"), and

is a member of a class of drugs known as "selective serotonin reuptake inhibitors" or "SSRIs."  Paxil

was first approved for use in the United States by the FDA in 1992 for the treatment of depression

in adults.

9.      The Mother Plaintiffs took Paxil as prescribed by their treating physicians while

pregnant.

10.     When the Infant Plaintiffs were born they were suffering from life-threatening

congenital defects and/or began to suffer from persistent pulmonary hypertension of the newborn

("PPHN"), a life-threatening disorder in which the newborn's arteries to the lungs remain constricted

after delivery, limiting the amount of blood flow to the lungs and therefore the amount of oxygen

into the bloodstream, or began to suffer from a similar life-threatening pulmonary condition.

11.     The defects suffered by the Infant Plaintiffs were a direct result of his/her mother's

ingestion of Paxil during her pregnancy in a manner and dosage recommended and prescribed by her

doctor.

12.     Prior to the Mother Plaintiffs becoming pregnant, GSK knew or should have known

that children were being born with congenital birth defects, heart defects, PPHN and other related

conditions to women who took Paxil during pregnancy.

13.     Prior to the Mother Plaintiffs becoming pregnant, GSK knew or should have known

that taking Paxil during pregnancy poses risks to the developing fetus.  GSK knew or should have

3

known that Paxil crosses the placenta, which could have important implications for the developing fetus.

14.     Prior to the time that the Mother Plaintiffs ingested Paxil during their pregnancy, GSK knew or should have known that Paxil posed an increased risk of congenital birth defects, heart defects, PPHN and other related conditions.

15.     During the entire time Paxil has been on the market in the United States, FDA regulations have required GSK to issue stronger warnings whenever there existed reasonable evidence of an association between a serious risk and Paxil. The regulations specifically state that a causal link need not have been proven to issue the new warnings.  Further, the regulations explicitly allowed GSK to issue such a warning without prior FDA approval.

16.     Thus, prior to the Mother Plaintiffs' pregnancies, GSK had the knowledge, the means and the duty to provide the medical community and the consuming public with a stronger warning regarding the association between Paxil and congenital birth defects, heart defects, PPHN and other related conditions, through all means necessary including but not limited to labeling, continuing education, symposiums, posters, sales calls to doctors, advertisements and promotional materials, etc. GSK breached this duty.

17.     Plaintiffs filed this lawsuit within the applicable limitations period of first suspecting that said drugs were the cause of Plaintiffs' injuries and/or Decedent's death. Plaintiffs could not, by the exercise of reasonable diligence, have discovered the wrongful cause of the Paxil-induced injuries and deaths at an earlier time because at the time of the these injuries and/or deaths the cause was unknown to Plaintiffs. Plaintiffs did not suspect, nor did Plaintiffs have reason to suspect, the cause of these injuries and/or deaths, or the tortious nature of the conduct causing these injuries and deaths, until less than the applicable limitations period prior to the filing of this action. Additionally, Plaintiffs were prevented from discovering this information sooner because the Defendant herein misrepresented and continue to misrepresent to the public and to the medical profession that the

drugs are safe to take during pregnancy and Defendant has fraudulently concealed facts and information that could have led Plaintiffs to discover a potential cause of action.

## COUNT I

### NEGLIGENCE & NEGLIGENCE PER SE

18.     Plaintiffs repeat and reiterate the allegations set forth above.

19.     At all times mentioned herein, GSK was under a duty to exercise reasonable care in researching, manufacturing, selling, merchandising, advertising, marketing, promoting, labeling, testing, distributing and analyzing Paxil to ensure that Paxil's use did not result in avoidable injuries.

20.     Plaintiffs' injuries as described herein were caused by the negligence and misrepresentations of GSK though its agents, servants and/or employees acting within the course and scope of their employment including among other things:

(a)     Carelessly and negligently researching, manufacturing, selling, merchandising, advertising, promoting, labeling, analyzing, testing, distributing, and marketing Paxil;

(b)     Failing to fully disclose the results of the testing and other information in its possession regarding the possibility that Paxil can interfere with the proper development of an unborn fetus;

(c)     Failing to continually monitor, test and analyze data regarding safety, efficacy and prescribing practices of its marketed drugs, including Paxil;

(d)     Being careless and negligent in that GSK knew or should have known that Paxil was a substance that would be actively transported through the placenta during pregnancy and could inhibit the health and development of the fetus;

(e)     Negligently and carelessly failing to adequately warn the medical community, the general public and Plaintiffs of the dangers of using Paxil during pregnancy;

5

(f)     Negligently and carelessly representing that Paxil was safe for use during pregnancy, when in fact, GSK knew or should have known that it was unsafe for this use;

(g)     Negligently and carelessly promoting Paxil as safe and effective for use with pregnant women when, in fact, it was unsafe;

(h)     Negligently and carelessly failing to act as a reasonably prudent drug manufacturer;

(i)     Negligently and carelessly over-promoting Paxil in a zealous and unreasonable way, without regard to the potential danger that it poses for an unborn fetus;

(j)     GSK promoted Paxil for use with pregnant women despite the fact that GSK knew or should have known that Paxil is associated with an increased risk of congenital abnormalities and pulmonary disorders.

21.     Furthermore, GSK's negligence was an un-excused breach of statutory duty established by federal regulations because Plaintiffs have suffered from the kind of harm the regulations were designed to prevent and Plaintiffs are members of the particular class of persons that those regulations were set out to protect.

22.     At all times herein mentioned, upon information and belief, the above-described culpable conduct by GSK was a proximate cause of Plaintiffs' injuries. GSK knew or should have known that Paxil is dangerous and unsafe for pregnant women and the developing fetus.

23.     The Infant Plaintiffs suffer from physical injuries, the full extent of which have not yet been determined, some or all of which are permanent and/or fatal, and the Infant Plaintiffs may suffer in the future from other diseases or conditions which have not yet been diagnosed. As a direct and proximate result of the aforesaid conduct of GSK, the Infant Plaintiffs have sustained in the past, and will sustain in the future, pain and suffering, mental anguish, embarrassment and humiliation, disfigurement and the loss of enjoyment of the pleasures of life without the presence of congenital birth defects, heart defects, PPHN and/or other related conditions, as well as past and future general

and special damages, including future medical care and treatment, in a sum in excess of the jurisdictional minimum of this Court.

24.     As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs have incurred loss of consortium, general, special and medical damages and related expenses in an amount in excess of the jurisdictional minimum of this Court.

25.     As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs of the Decedents have sustained pecuniary loss resulting from the loss of their child's society, companionship, comfort, attention, protection, care, love, affection, advice, services, moral support, economic support and general and special damages in a sum in excess of the jurisdictional minimum of this Court. As a further proximate result of GSK's conduct, the Parent Plaintiffs of the Decedents have incurred expenses for funeral, burial, and other costs pertaining to their Decedent's death in an amount to be ascertained.

26.     As a direct and proximate result of the aforesaid conduct of GSK, the Decedents sustained pecuniary loss resulting from the pain and suffering from their congenital malformations and/or pulmonary conditions, by the surgeries and procedures they underwent between the time of their birth and their death and additional general and special damages in a sum in excess of the jurisdictional minimum of this Court.

27.     The forgoing actions of the Defendant were intentional, malicious, wanton, willful or oppressive or were done with gross negligence and reckless indifference to the Plaintiffs, and the public's safety and welfare.

WHEREFORE, Plaintiffs demand judgment in their favor and against GSK for an amount in excess of $50,000.00, compensatory and punitive damages and costs of suit in an amount to be determined upon the trial of this matter.

/ / /

/ / /

/ / /

7

## COUNT II

### NEGLIGENT PHARMACO-VIGILANCE

28.     Plaintiffs repeat and reiterate the allegations set forth above.

29.     GSK has an ongoing duty of pharmaco-vigilance.  As part of this duty, GSK is required to continually monitor, test and analyze data regarding the safety, efficacy and prescribing practices of its marketed drugs, including Paxil.  GSK continually receives reports from its own clinical trials, practicing physicians, individual patients and regulatory authorities of adverse events that occur in patients taking Paxil and its other marketed drugs.  Furthermore, GSK continues to conduct clinical trials for its marketed drugs long after the drug is approved for use.  GSK has a duty to inform doctors, regulatory agencies and the public of new safety and efficacy information it learns, or should have learned, about its marketed drugs once that information becomes available to GSK, whether through GSK clinical trials, other outside sources or pharmaco-vigilance activities.  Specifically, when GSK learns, or should have learned, of new safety information associated with its marketed drugs, it has a duty to promptly disseminate that data to the public.  GSK also has a duty to monitor epidemiological and pharmaco-vigilance data regarding its marketed drugs and promptly report any safety concerns that arise through epidemiologic study or data.

30.     GSK breached its duty with respect to Plaintiffs.  GSK, through various sources, including but not limited to, clinical trials and other adverse event reports, learned that there was a substantial risk of congenital birth defects, heart defects, PPHN and other related conditions, associated with Paxil use during pregnancy and failed to inform doctors, regulatory agencies and the public of this risk.  GSK had the means and the resources to perform its pharmaco-vigilance duties for the entire time Paxil has been on the market in the United States.

31.     The Infant Plaintiffs suffer from physical injuries, the full extent of which have not yet been determined, some or all of which are permanent and/or fatal, and the Infant Plaintiffs may suffer in the future from other diseases or conditions which have not yet been diagnosed.  As a direct and proximate result of the aforesaid conduct of GSK, the Infant Plaintiffs have sustained pecuniary

loss resulting from the pain and suffering caused by their congenital birth defects, heart defects, PPHN and/or other related conditions, by the surgeries and procedures they have already undergone, and the surgeries and procedures that they will need to undergo in the future, as well as their inability to enjoy their life as a normal child without the presence of congenital birth defects, heart defects, PPHN and/or other related conditions and additional general and special damages in a sum in excess of the jurisdictional minimum of this Court.

32. As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs have incurred loss of consortium, general, special and medical damages and related expenses in an amount in excess of the jurisdictional minimum of this Court.

33. As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs of the Decedents have sustained pecuniary loss resulting from the loss of their child's society, companionship, comfort, attention, protection, care, love, affection, advice, services, moral support, economic support and general and special damages in a sum in excess of the jurisdictional minimum of this Court. As a further proximate result of GSK's conduct, the Parent Plaintiffs of the Decedents have incurred expenses for funeral, burial and other costs pertaining to their Decedent's death in an amount to be ascertained.

34. As a direct and proximate result of the aforesaid conduct of GSK, the Decedents sustained pecuniary loss resulting from the pain and suffering from their congenital malformations and/or pulmonary conditions, by the surgeries and procedures they underwent between the time of their birth and their death and additional general and special damages in a sum in excess of the jurisdictional minimum of this Court.

35. The forgoing actions of the Defendant were actions as described herein, were intentional, malicious, wanton, willful or oppressive or were done with gross negligence and reckless indifference to the Plaintiffs, and the public's safety and welfare.

9

WHEREFORE, Plaintiffs demand judgment in their favor and against GSK for an amount in excess of $50,000.00, compensatory and punitive damages and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT III

### STRICT LIABILITY

36.  Plaintiffs repeat and reiterate the allegations set forth above.

37.  GSK manufactures and/or supplies Paxil and is strictly liable to Plaintiffs for designing, creating, manufacturing, marketing, labeling, distributing, selling and placing into the stream of commerce the product Paxil.

38.  The product Paxil, manufactured and/or supplied by GSK, was defective in design or formulation, in that, when it left the hands of the manufacture and/or supplier, it was unreasonably dangerous, it was more dangerous than an ordinary consumer would expect and more dangerous than other antidepressants.

39.  The product, Paxil, that was manufactured and/or supplied by GSK, was defective in design or formulation in that, when it left the hands of the manufacturer and/or supplier, the foreseeable risks exceeded the benefits associated with the design or formulation.

40.  The product Paxil, manufactured and/or supplied by GSK, was defective due to inadequate warnings or instructions because the manufacturer knew or should have known that the product created, among other things, when taken during pregnancy, a significant increased risk of congenital birth defects, heart defects, PPHN and/or other related conditions and abnormal development of the unborn child and GSK failed to adequately warn of said risks.

41.  The Paxil that was manufactured and/or supplied by GSK was defective due to inadequate pre-market testing.

42.  The Paxil that was manufactured and/or supplied by GSK was defective due to GSK's failure to provide adequate initial warnings and post-marketing warnings or instruction after GSK knew or should have known of the risk of increased risk of congenital birth defects, heart

10

defects, PPHN and/or other related conditions and abnormal development of the unborn child from the use of Paxil during pregnancy and continued to promote the product.

43.     The Infant Plaintiffs suffer from physical injuries, the full extent of which have not yet been determined, some or all of which are permanent and/or fatal, and the Infant Plaintiffs may suffer in the future from other diseases or conditions which have not yet been diagnosed. As a direct and proximate result of the aforesaid conduct of GSK, the Infant Plaintiffs have sustained in the past, and will sustain in the future, pain and suffering, mental anguish, embarrassment and humiliation, disfigurement and the loss of enjoyment of the pleasures of life without the presence of congenital birth defects, heart defects, PPHN and/or other related conditions, as well as past and future general and special damages, including future medical care and treatment, in a sum in excess of the jurisdictional minimum of this Court.

44.     As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs have incurred loss of consortium, general, special and medical damages and related expenses in an amount in excess of the jurisdictional minimum of this Court.

45.     As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs of the Decedents have sustained pecuniary loss resulting from the loss of their child's society, companionship, comfort, attention, protection, care, love, affection, advice, services, moral support, economic support and general and special damages in a sum in excess of the jurisdictional minimum of this Court. As a further proximate result of GSK's conduct, the Parent Plaintiffs of the Decedents have incurred expenses for funeral, burial and other costs pertaining to their Decedent's death in an amount to be ascertained.

46.     As a direct and proximate result of the aforesaid conduct of GSK, the Decedents sustained pecuniary loss resulting from the pain and suffering from their congenital malformations and/or pulmonary conditions, by the surgeries and procedures they underwent between the time of their birth and their death and additional general and special damages in a sum in excess of the jurisdictional minimum of this Court.

11

47. The forgoing actions of GSK were intentional, malicious, wanton, willful or oppressive or were done with gross negligence and reckless indifference to the Plaintiffs, and the public's safety and welfare.

WHEREFORE, Plaintiffs demand judgment in their favor and against GSK for an amount in excess of $50,000.00, compensatory and punitive damages and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT IV

### FAILURE TO WARN
(Restatement Second of Torts §388)

48. Plaintiffs repeat and reiterate the allegations set forth above.

49. At all times herein mentioned, Paxil was unsafe for use by pregnant women and GSK knew or should have known that said product was unsafe.

50. At all times herein mentioned, using Paxil during pregnancy was associated with a significantly increased risk of serious congenital birth defects, heart defects, PPHN and/or other related conditions and GSK knew or should have known that said product is unsafe when taken during pregnancy because of the said effects.

51. At all times hereinafter mentioned and before the Mother Plaintiffs' ingestion of Paxil during their pregnancy, neither members of the medical community nor members of the general public knew the dangers existed with respect to Paxil's association with congenital birth defects, heart defects, PPHN and/or other related conditions.

52. The Mother Plaintiffs used Paxil in the manner in which GSK intended it to be used.

53. The Mother Plaintiffs used or otherwise ingested Paxil in the amount and manner and for the purpose recommended by GSK.

54. At all times material hereto, U.S. marketed Paxil was not accompanied by complete and proper warnings for safe, informed use. Specifically, the labeling accompanying Paxil did not warn physicians in general, or Plaintiffs in particular, of the dangers inherent in its use, particularly of the drug's association with congenital birth defects, heart defects, PPHN and/or other related

12

conditions. Further, the labeling failed to adequately inform physicians in general, or Plaintiffs in particular, of Paxil's association with a significantly increased risk of congenital birth defects, heart defects, PPHN and/or other related conditions if a woman ingests Paxil during her pregnancy and oversold Paxil's benefits, thus depriving physicians of necessary information needed to perform an adequate risk/benefit analysis. Furthermore, GSK failed to adequately warn doctors and the medical community of this dangerous risk using the other mediums at its disposal, including, but not limited to, medical journal articles, sales representatives, Dear Doctor letters, presentations, conferences, medical school information and all of its promotional material and activities.

55.    GSK promoted and maintained Paxil on the market with the knowledge of Paxil's unreasonable risk to the public in general and specifically to Plaintiffs.

56.    Paxil, as used by the Mother Plaintiffs during their pregnancy, was defective and unreasonably dangerous when sold by GSK, who is liable for the injuries arising from its manufacture and the Mother Plaintiffs' use.

57.    The Infant Plaintiffs suffer from physical injuries, the full extent of which have not yet been determined, some or all of which are permanent and/or fatal, and the Infant Plaintiffs may suffer in the future from other diseases or conditions which have not yet been diagnosed. As a direct and proximate result of the aforesaid conduct of GSK, the Infant Plaintiffs have sustained in the past and will sustain in the future, pain and suffering, mental anguish, embarrassment and humiliation, disfigurement and the loss of enjoyment of the pleasures of life without the presence of congenital birth defects, heart defects, PPHN and/or other related conditions, as well as past and future general and special damages, including future medical care and treatment, in a sum in excess of the jurisdictional minimum of this Court.

58.    As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs have incurred loss of consortium, general, special and medical damages and related expenses in an amount in excess of the jurisdictional minimum of this Court.

13

59.    As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs of the Decedents have sustained pecuniary loss resulting from the loss if their child's society, companionship, comfort, attention, protection, care, love, affection, advice, services, moral support, economic support and general and special damages in a sum in excess of the jurisdictional minimum of this Court. As a further proximate result of GSK's conduct, the Parent Plaintiffs of the Decedents have incurred expenses for funeral, burial and other costs pertaining to their Decedent's death in an amount to be ascertained.

60.    As a direct and proximate result of the aforesaid conduct of GSK, the Decedents sustained pecuniary loss resulting from the pain and suffering from their congenital malformations and/or pulmonary conditions, by the surgeries and procedures they underwent between the time of their birth and their death and additional general and special damages in a sum in excess of the jurisdictional minimum of this Court.

61.    The forgoing actions of the Defendant were actions as described herein, were intentional, malicious, wanton, willful or oppressive or were done with gross negligence and reckless indifference to the Plaintiffs and the public's safety and welfare.

WHEREFORE, Plaintiffs demand judgment in their favor and against GSK for an amount in excess of $50,000.00, compensatory and punitive damages and costs of suit in an amount to be determined upon the trial of this matter.

## COUNTS V & VI

## BREACH OF EXPRESS AND IMPLIED WARRANTY

62.    Plaintiffs repeat and reiterate the allegations set forth above.

63.    At all times hereinaftermentioned, upon information and belief, GSK, by directly and indirectly advertising, marketing and promoting Paxil for the treatment of women during pregnancy and by placing this drug in the stream of commerce knowing that Paxil would be prescribed to pregnant women in reliance upon the representations of GSK, expressly warranted to all foreseeable

users of the drug, including the Mother Plaintiffs, that Paxil was safe and effective for the treatment of women during pregnancy and without significant risk to the fetus.

64.    GSK impliedly warranted in manufacturing, distributing, selling, advertising, marketing and promoting Paxil to all foreseeable users, including the Mother Plaintiffs, that Paxil was safe and effective for the purposes for which it had been placed in the stream of commerce by GSK, including for the treatment of pregnant women, and that Paxil was reasonably safe, proper, merchantable and fit for the intended purpose, including for the treatment of pregnant women and without significant risk to the fetus.

65.    That at all time hereinafter mentioned, the Mother Plaintiffs relied upon the aforesaid express and implied warranties by GSK.

66.    That at all times hereinafter mentioned, the Mother Plaintiffs' use of Paxil was consistent with the purposes for which GSK directly and indirectly advertised, marketed and promoted Paxil, and the Mother Plaintiffs' use of Paxil was reasonably contemplated, intended, and foreseen by GSK at the time of the distribution and sale of Paxil by GSK, and, therefore, the Mother Plaintiffs' use of Paxil was within the scope of the above-described express and implied warranties.

67.    GSK breached the aforesaid express and implied warranties because Paxil was not safe and effective for the treatment of women during pregnancy because it exposed the developing fetus to a significant risk of serious injury, and because the Mother Plaintiffs' use of Paxil for treatment during her pregnancy caused their child's congenital birth defects, heart defects, PPHN and/or other related conditions.

68.    The Infant Plaintiffs suffer from physical injuries, the full extent of which have not yet been determined, some or all of which are permanent and/or fatal, and the Infant Plaintiffs may suffer in the future from other diseases or conditions which have not yet been diagnosed. As a direct and proximate result of the aforesaid conduct of GSK, the Infant Plaintiffs have sustained in the past, and will sustain in the future, pain and suffering, mental anguish, embarrassment and humiliation, disfigurement and the loss of enjoyment of the pleasures of life without the presence of congenital

birth defects, heart defects, PPHN and/or other related conditions, as well as past and future general and special damages, including future medical care and treatment, in a sum in excess of the jurisdictional minimum of this Court.

69.     As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs have incurred loss of consortium, general, special and medical damages and related expenses in an amount in excess of the jurisdictional minimum of this Court.

70.     As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs of the Decedents have sustained pecuniary loss resulting from the loss of their child's society, companionship, comfort, attention, protection, care, love, affection, advice, services, moral support, economic support, and general and special damages in a sum in excess of the jurisdictional minimum of this Court. As a further proximate result of GSK's conduct, the Parent Plaintiffs of the Decedents have incurred expenses for funeral, burial and other costs pertaining to their Decedent's death in an amount to be ascertained.

71.     As a direct and proximate result of the aforesaid conduct of GSK, the Decedents sustained pecuniary loss resulting from the pain and suffering from their congenital malformations and/or pulmonary conditions, by the surgeries and procedures they underwent between the time of their birth and their death and additional general and special damages in a sum in excess of the jurisdictional minimum of this Court.

72.     The forgoing actions of GSK were intentional, malicious, wanton, willful or oppressive or were done with gross negligence and reckless indifference to the Plaintiffs and the public's safety and welfare.

WHEREFORE, for the above reasons, Plaintiffs demand judgment in their favor and against GSK for an amount in excess of $50,000.00, compensatory and punitive damages and costs of suit in an amount to be determined upon the trial of this matter.

///

///

16

03/07/07  17:41 FAX 215 751 5139        GlaxoSmithKline Legal    → KAREN KARPINSKI        ☒019

## COUNT VII

### FRAUD

73.     Plaintiffs repeat and reiterate the allegations set forth above.

74.     GSK, having undertaken the manufacturing, marketing, dispensing, distribution and promotion of Paxil described herein, owed a duty to provide accurate and complete information regarding these products.

75.     GSK's advertising program, by affirmative misrepresentations and omission, falsely and deceptively sought to create the image and impression that the use of Paxil was safe for human use; had no, or no unacceptable side effects; had fewer side effects than other antidepressants; and would not interfere with daily life.

76.     On information and belief, GSK purposefully concealed, failed to disclose, misstated, downplayed and understated the health hazards and risks associated with the use of Paxil.  GSK through promotional literature, deceived potential users; and prevalence of said drug by relying on only allegedly positive information, including testimonials from allegedly satisfied users, and manipulating statistics to suggest widespread acceptability, while concealing, misstating and downplaying the known adverse and serious health effects.  GSK falsely and deceptively kept relevant information from potential Paxil users and minimized prescriber concerns regarding the safety and efficacy of Paxil.

77.     In particular, in the materials disseminated by GSK, GSK falsely and deceptively misrepresented or omitted a number of material facts regarding the previously stated allegations including, but not limited to, the following:

    (a)    The presence and adequacy of testing of Paxil, and

    (b)    The severity and frequency of adverse congenital birth defects, heart defects, PPHN and/or other related conditions caused by a mother taking Paxil during pregnancy.

17

78.     The aforementioned misrepresentations by GSK were reasonably relied upon by the Mother Plaintiffs and/or their prescribing physicians to their detriment.

79.     The Infant Plaintiffs suffer from physical injuries, the full extent of which have not yet been determined, some or all of which are permanent and/or fatal, and the Infant Plaintiffs may suffer in the future from other diseases or conditions which have not yet been diagnosed. As a direct and proximate result of the aforesaid conduct of GSK, the Infant Plaintiffs have sustained in the past, and will sustain in the future, pain and suffering, mental anguish, embarrassment and humiliation, disfigurement and the loss of enjoyment of the pleasures of life without the presence of congenital birth defects, heart defects, PPHN and/or other related conditions, as well as past and future general and special damages, including future medical care and treatment, in a sum in excess of the jurisdictional minimum of this Court.

80.     As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs have incurred loss of consortium, general, special and medical damages and related expenses in an amount in excess of the jurisdictional minimum of this Court.

81.     As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs of the Decedents have sustained pecuniary loss resulting from the loss of their child's society, companionship, comfort, attention, protection, care, love, affection, advice, services, moral support, economic support and general and special damages in a suit in excess of the jurisdictional minimum of this Court. As a further proximate result of GSK's conduct, the Parent Plaintiffs of the Decedents have incurred expenses for funeral, burial and other costs pertaining to their Decedent's death in an amount to be ascertained.

82.     As a direct and proximate result of the aforesaid conduct of GSK, the Decedents sustained pecuniary loss resulting from the pain and suffering from their congenital malformations and/or pulmonary conditions, by the surgeries and procedures they underwent between the time of their birth and their death and additional general and special damages in a sum in excess of the jurisdictional minimum of this Court.

83.     The forgoing actions of GSK were intentional, malicious, wanton, willful or oppressive or were done with gross negligence and reckless indifference to the Plaintiffs, and the public's safety and welfare.

WHEREFORE, Plaintiffs demand judgment in their favor and against GSK for an amount in excess of $50,000.00, compensatory and punitive damages and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT VIII

## LOSS OF CONSORTIUM AND LOSS OF INCOME

84.     Plaintiffs repeat and reiterate the allegations set forth above.

85.     As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs have incurred loss of consortium, general, special and medical damages and related expenses in an amount in excess of the jurisdictional minimum of this Court.

86.     As a result of the wrongful conduct by GSK described herein, the Parent Plaintiffs of the Decedents suffered a loss of love, society, comfort, affection, companionship, services, and moral support in an amount to be determined at trial.  Furthermore, as a result of the wrongful conduct by GSK described herein, the Parent Plaintiffs suffered a loss of income in an amount to be determined at trial.

## COUNT IX

## CAUSE OF ACTION FOR SURVIVAL

87.     Plaintiffs repeat and reiterate the allegations set forth above.

88.     As a direct and proximate result of the wrongful conduct of GSK as described herein, the Parent Plaintiffs' of the Decedents children suffered great pain and suffering and other personal injury and damaged before their death.

89.     As a direct and proximate result of the conduct alleged herein, before their death, the Decedents sustained damages according to proof.

## COUNT X

### NEGLIGENT DESIGN

90.    Plaintiffs repeat and reiterate the allegations set forth above.

91.    GSK was the manufacturer, seller, distributor, marketer, and/or supplier of Paxil, which was negligently designed.

92.    GSK was negligent in developing, designing, processing, manufacturing, inspecting, testing, packaging, selling, distributing, supplying, marketing and promoting Paxil which was defective and presented an unreasonable risk of harm to consumers. Paxil was negligently designed in ways which include, but are not limited to, one or more of the following:

     (a)    When placed in the stream of commerce, Paxil contained unreasonably dangerous design defects and was not reasonably safe and fit for its intended or reasonably foreseeable purpose or as intended to be used, thereby subjecting users and/or consumers of the drug, including Plaintiffs, to risks which exceeded the benefits of the drug;

     (b)    Paxil was insufficiently tested;

     (c)    Paxil caused harmful side effects that outweighed any potential utility;

     (d)    Paxil was not accompanied by adequate labeling, instructions for use and/or warnings to fully apprise the medical, pharmaceutical and/or scientific communities, and users and/or consumers of the drug, including Plaintiffs, of the potential risks and serious side effects associated with its use.

     (e)    In light of the potential and actual risk of harm associated with Paxil's use, a reasonable person who had actual knowledge of this potential and actual risk of harm would have concluded that Paxil should not have been marketed in that condition.

     (f)    GSK was under a duty to act for the protection of consumers, such as Plaintiffs. GSK owed a duty to consumers to exercise reasonable care in

20

developing, designing, processing, manufacturing, inspecting, testing, packaging, selling, distributing, supplying, marketing and promoting Paxil, and defendant breached that duty by the conduct as alleged herein.

(g)    GSK knew or should have known that use of Paxil as intended imposed unreasonable risks to the health of consumers and the unborn fetuses of pregnant consumers. GSK knew of the grave risks caused by their products from investigation and testing performed by themselves or others, or, to the extent they did not fully know of those risks, it was because they unreasonably failed to perform appropriate, adequate and proper investigations and tests that would have disclosed those risks.

(h)    GSK's conduct described above was grossly negligent in that their actions involved willful and reckless conduct and were carried out with disregard for the unreasonable risk of Paxil and its potential for harm to consumers and the fetuses of pregnant consumers.

93.    The Infant Plaintiffs suffer from physical injuries, the full extent of which have not yet been determined, some or all of which are permanent and/or fatal, and the Infant Plaintiffs may suffer in the future from other diseases or conditions which have not yet been diagnosed. As a direct and proximate result of the aforesaid conduct of GSK, the Infant Plaintiffs have sustained in the past, and will sustain in the future, pain and suffering, mental anguish, embarrassment and humiliation, disfigurement and the loss of enjoyment of the pleasures of life without the presence of congenital birth defects, heart defects, PPHN and/or other related conditions, as well as past and future general and special damages, including future medical care and treatment, in a sum in excess of the jurisdictional minimum of this Court.

94.    As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs have incurred loss of consortium, general, special and medical damages and related expenses in an amount in excess of the jurisdictional minimum of this Court.

95. As a direct and proximate result of the aforesaid conduct of GSK, the Parent Plaintiffs of the Decedents have sustained pecuniary loss resulting from the loss of their child's society, companionship, comfort, attention, protection, care, love, affection, advice, services, moral support, economic support and general and special damages in a sum in excess of the jurisdictional minimum of this Court. As a further proximate result of GSK's conduct, the Parent Plaintiffs of the Decedents have incurred expenses for funeral, burial, and other costs pertaining to their Decedent's death in an amount to be ascertained.

96. As a direct and proximate result of the aforesaid conduct of GSK, the Decedents sustained pecuniary loss resulting from the pain and suffering from their congenital malformations and/or pulmonary conditions, by the surgeries and procedures they underwent between the time of their birth and their death and additional general and special damages in a sum in excess of the jurisdictional minimum of this Court.

97. The forgoing actions of GSK were actions as described herein, were intentional, malicious, wanton, willful or oppressive or were done with gross negligence and reckless indifference to the Plaintiffs and the public's safety and welfare.

WHEREFORE, Plaintiffs demand judgment in their favor and against GSK for an amount in excess of $50,000.00, compensatory and punitive damages and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT XI

## WRONGFUL DEATH

98. Plaintiffs repeat and reiterate the allegations set forth above.

99. As a direct and proximate result of the aforesaid, because of their mothers' ingestion of Paxil during their pregnancy, the Decedents developed congenital birth defects, heart defects, PPHN and/or other related conditions which caused extreme pain, suffering and mental anguish and ultimately caused their death.

22

100.    As a direct and proximate result of the aforesaid conduct of GSK, the Decedents sustained pecuniary loss resulting from the pain and suffering from their congenital malformations and/or pulmonary conditions, by the surgeries and procedures they underwent between the time of their birth and their death and additional general and special damages in a sum in excess of the jurisdictional minimum of this Court.

101.    The forgoing actions of GSK were actions as described herein, were intentional, malicious, wanton, willful or oppressive or were done with gross negligence and reckless indifference to the Plaintiffs, and the public's safety and welfare.

WHEREFORE, Plaintiffs demand judgment in their favor and against GSK for an amount in excess of $50,000.00, compensatory and punitive damages and costs of suit in an amount to be determined upon the trial of this matter.

## COUNT XII

## DAMAGES

102.    Plaintiffs repeat and reiterate the allegations set forth above.

103.    As a direct and proximate result of the negligence, strict liability, failure to warn, implied warranty, breach of express and implied warranties, fraud, as described in Counts I-XI *supra*, the Infant Plaintiffs suffer from physical injuries, the full extent of which have not yet been determined, some or all of which are permanent and/or fatal, and the Infant Plaintiffs may suffer in the future from other diseases or conditions which have not yet been diagnosed. As a direct and proximate result of the aforesaid conduct of GSK, the Infant Plaintiffs have sustained in the past, and will sustain in the future, pain and suffering, mental anguish, embarrassment and humiliation, disfigurement and the loss of enjoyment of the pleasures of life, without the presence of congenital birth defects, heart defects, PPHN and/or other related conditions, as set forth in each Plaintiff's "Short-Form" Complaint to be filed.

104.    As a direct and proximate result of the aforesaid, Plaintiffs were obliged to spend various sums of money to treat their congenital birth defects, heart defects, PPHN and/or other

related conditions and Plaintiffs continue to be obliged for the expenses of same, as a direct and proximate result of the aforesaid, Plaintiffs have sustained a loss of earnings and earning capacity; and as a direct and proximate result of the aforesaid, the Infant Plaintiffs' enjoyment of life has been impaired and the Infant Plaintiffs' life expectancies shortened, all to Plaintiffs' great loss.

105.    As a direct and proximate result of the aforesaid, the Infant Plaintiffs have undergone great physical pain and mental anguish.

106.    As a direct and proximate result of the aforesaid, the Decedents sustained great physical pain and mental anguish as a result of their congenital birth defects, heart defects, PPHN and/or other related conditions and the surgeries and procedures they underwent between the time of their birth and their death in an attempt to treat those defects and/or conditions.

107.    As a direct and proximate result of the aforesaid, and since the Plaintiffs first learned of the Infant Plaintiffs injuries, Plaintiffs have developed severe anxiety, hysteria or phobias, and or all of which have developed into a reasonable and traumatic fear of an increased risk of additional injury and or progression of the existing conditions(s).

108.    As a direct and proximate result of the aforesaid, Plaintiffs have and will continue to suffer permanent and ongoing psychological damage which may require future psychological and or medical treatment.

109.    As a direct and proximate result of the aforesaid, Plaintiffs have and will continue to suffer a disintegration and deterioration of the family unit and the relationships existing therein, resulting in enhanced anguish, depression and other symptoms of psychological stress and disorder.

110.    As a direct and proximate result of the aforesaid, the Decedents and the Injured Plaintiffs incurred and will continue to incur hospital, nursing and medical expenses. Decedents' beneficiaries have incurred hospital, medical and funeral expenses as a result of Decedents' deaths. The Plaintiff Parents of the Decedents' bring these claims as the Personal Representatives of the Estates of the Decedents on behalf of the Decedents' lawful beneficiaries for the damages and pecuniary losses sustained by said beneficiaries.

## COUNT XII

### PUNITIVE DAMAGES

111.   Plaintiffs repeat and reiterate the allegations set forth above.

112.   The Plaintiffs are entitled to punitive damages because GSK's failure to warn was reckless and without regard for the public's safety and welfare.  GSK misled both the medical community and the public at large, including the Plaintiffs herein, by making false representations about the safety of Paxil.  GSK downplayed, understated and/or disregarded its knowledge of the serious effects of taking Paxil during pregnancy despite available information demonstrating that Paxil was likely to cause serious and sometimes fatal congenital birth defects, heart defects, PPHN and/or other related conditions in unborn children when taken during pregnancy.

113.   GSK was or should have been in the possession of evidence demonstrating that Paxil caused congenital birth defects, heart defects, PPHN and/or other related conditions in unborn children when taken during pregnancy.  Nevertheless, it continued to market the products by providing false and misleading information with regard to safety and efficacy.

114.   GSK's above described actions were performed willfully, intentionally and with reckless disregard for the rights of Plaintiffs and the public.

115.   Accordingly, Plaintiffs seek and are entitled to punitive or exemplary damages in an amount to be determined at trial.

### PRAYER

WHEREFORE, Plaintiffs pray for judgment against GSK as follows:

A.   For general damages in a sum exceeding this court's jurisdictional minimum;

B.   For damages for loss of consortium;

C.   For reasonable medical expenses according to proof;

D.   For all damages as allowed by law;

E.   For prejudgment interest and post-judgment interest as allowed by law;

F.   For delay damages pursuant to Pa. R.C.P. No. 238;

G.    For punitive and exemplary damages as allowed by law;

H.    For the costs of suit herein incurred; and

I.    For such other and further relief as this Court may deem just and proper.

Dated: March 5, 2007

Respectfully Submitted,

_Cara J. Luther_

Cara Luther (PA.B. #52545)
cluther@baumhedlundlaw.com
BAUM + HEDLUND, A Professional Corporation
1500 Market Street, 12th Floor, East Tower
Philadelphia, PA 19102
Telephone: 215.665.5659
Facsimile: 215.569.8228

Ronald L. M. Goldman, Esq.
rgoldman@baumhedlundlaw.com
Karen Barth Menzies, Esq.
Kbmenzies@baumhedlundlaw.com
Jennifer R. Liakos, Esq.
jliakos@baumhedlundlaw.com
BAUM + HEDLUND, A Professional Corporation
12100 Wilshire Blvd., Suite 950
Los Angeles, CA 90025
Telephone: 310.207.3233
Facsimile: 310.207.4204

Clayton Clark, Esq.
Riley Burnett, Esq.
CLARK BURNETT, LLP
440 Louisiana (Lyric Center), 16th Floor
Houston, TX 77002
Telephone: 713.757.1400
Facsimile: 713.759.1217

Bryan Aylstock Esq.
AYLSTOCK, WITKIN & SASSER, P.L.C
4400 Bayou Blvd., Suite 58
Pensacola, FL 32503
Telephone: 281.272.0781
Facsimile: 850.916.7449

03/07/07   17:44 FAX 215 751 5139          GlexoSmithKline Legal      → KAREN KARPINSKI      @029

John T. Boundas, Esq.
jboundas@williamsbailey.com
WILLIAMS BAILEY, L.L.P.
8441 Gulf Freeway, Suite 600
Houston, TX 77017-5051
Phone: 1-800-220-9341 or 713-230-2200
Fax: 713-643-6226

Matthew E. Lundy
mlundy@lundydavis.com
LUNDY & DAVIS, L.L.P.
333 N. Sam Houston Parkway East, Suite 375
Houston, TX 77060
Phone: (281) 272-0797
Fax: (281) 272-0781

*Attorneys for Plaintiff*

## JURY TRIAL DEMAND

Plaintiffs herein invoke their right to a trial by a jury of 12 persons.

Dated: March _5_, 2007                    Respectfully Submitted,

                                          Cara J. Luther, Esq.

28

## ATTORNEY'S VERIFICATION

I, Cara J. Luther, Esq., hereby state:

1.     I am one of the Plaintiffs' attorneys in this action.

4.     I verify that the statements made in the foregoing Master Long-Form Complaint are true and correct to the best of my knowledge, information and belief; and

5.     I understand that the statements in said Complaint are subject to the penalties of 18 Pa. C.S.A. §4904 relating to unsworn falsification to authorities.

Date: March 5, 2007

Cara J. Luther, Esquire
Attorney ID # 52545
Baum + Hedlund, A Professional Corporation
1500 Market Street, 12th Floor, East Tower
Philadelphia, Pennsylvania 19102
Telephone: 215.665.5659
Facsimile: 215.569.8228

Attorney for Plaintiffs

29

# Exhibit B

C. Becker 10/19/11

Court of Common Pleas of Philadelphia County
Trial Division

## Civil Cover Sheet

SEPTEMBER 2011    003694

| | |
|---|---|
| **PLAINTIFF'S NAME**<br>JOSEPH CAMMAROTA | **DEFENDANT'S NAME**<br>SMITHKLINE BEECHAM CORPORATION, ALIAS:<br>GLAXOSMITHKLINE |
| **PLAINTIFF'S ADDRESS**<br>4 ALMADERA DRIVE<br>WAYNE NJ 07470 | **DEFENDANT'S ADDRESS**<br>ONE FRANKLIN PLAZA<br>PHILADELPHIA PA 19102-1225 |
| **PLAINTIFF'S NAME**<br>AMY LYNN HALLOCK | **DEFENDANT'S NAME**<br>RECEIVED |
| **PLAINTIFF'S ADDRESS**<br>4 ALMADERA DRIVE<br>WAYNE NJ 07470 | **DEFENDANT'S ADDRESS**<br>OCT 21 2011 |
| **PLAINTIFF'S NAME** | **DEFENDANT'S NAME**<br>ANDREA L. PARRY |
| **PLAINTIFF'S ADDRESS** | **DEFENDANT'S ADDRESS** |

| TOTAL NUMBER OF PLAINTIFFS | TOTAL NUMBER OF DEFENDANTS | COMMENCEMENT OF ACTION |
|---|---|---|
| 2 | 1 | ☒ Complaint ☐ Petition Action ☐ Notice of Appeal<br>☐ Summons ☐ Transfer From Other Jurisdictions |

| AMOUNT IN CONTROVERSY | COURT PROGRAMS | | |
|---|---|---|---|
| ☐ $50,000.00 or less<br>☒ More than $50,000.00 | ☐ Arbitration<br>☐ Jury<br>☐ Non-Jury<br>☐ Other: | ☐ Commerce<br>☐ Minor Court Appeal<br>☐ Statutory Appeals | ☐ Settlement<br>☐ Minors<br>☐ W/D/Survival |

**CASE TYPE AND CODE**

TK - MASS TORT - PAXIL-BIRTH DEFECT

**STATUTORY BASIS FOR CAUSE OF ACTION**

| RELATED PENDING CASES (LIST BY CASE CAPTION AND DOCKET NUMBER) | FILED<br>PRO PROTHY<br><br>SEP 30 2011<br><br>J. MURPHY | IS CASE SUBJECT TO<br>COORDINATION ORDER?<br>YES        NO |
|---|---|---|

TO THE PROTHONOTARY:

Kindly enter my appearance on behalf of Plaintiff/Petitioner/Appellant:  JOSEPH CAMMAROTA , AMY LYNN HALLOCK

Papers may be served at the address set forth below.

| NAME OF PLAINTIFF'S/PETITIONER'S/APPELLANT'S ATTORNEY<br>ADAM D. PEAVY ESQ | **ADDRESS**<br>440 LOUISIANA STREET<br>SUITE 2100<br>HOUSTON TX 77002 |
|---|---|
| **PHONE NUMBER**<br>(713) 425-7100 | **FAX NUMBER**<br>(713) 425-7101 | |
| **SUPREME COURT IDENTIFICATION NO.**<br>205327 | **E-MAIL ADDRESS**<br>apeavy@bpblaw.com |
| **SIGNATURE OF FILING ATTORNEY OR PARTY**<br>ADAM PEAVY ESQ | **DATE SUBMITTED**<br>Friday, September 30, 2011, 10:30 am |

FINAL COPY (Approved by the Prothonotary Clerk)

Adam D. Peavy, Esq.
apeavy@bpblaw.com
W. Harris Junell, Esq.
hjunell@bpblaw.com
T. Scott Allen, Esq.
sallen@bpblaw.com
**BAILEY PERRIN BAILEY**
440 Louisiana Street, Suite 2100
Houston, TX 77002
Telephone: (713) 425-7100
Facsimile: (713) 425-7101

Rosemary Pinto, Esq.
RPinto@feldmanpinto.com
**FELDMAN & PINTO**
1604 Locus Street, FL 2R
Philadelphia, PA 19103
Telephone: (215) 546-4385

*Attorneys for Plaintiff(s)*



This Is Not An Arbitration Case.
An Assessment of Damages Is
Required.

| | | |
|---|---|---|
| Joseph Cammarota, a Minor, by Amy Lynn Hallock, Guardian, and Amy Lynn Hallock, Individually<br>4 Almadera Drive<br>Wayne, NJ 07470 | ) ) ) ) ) | COURT OF COMMON PLEAS TRIAL DIVISION PHILADELPHIA COUNTY |
| Plaintiffs, | ) ) ) | SEPTEMBER 2011 TERM |
| vs. | ) ) | NO.: _____ |
| SmithKline Beecham Corporation d/b/a GlaxoSmithKline<br>One Franklin Plaza<br>Philadelphia, PA 19102-1225 | ) ) ) ) | IN RE PAXIL PREGNANCY CASES |
| Defendant. | ) ) | JURY TRIAL DEMANDED |

## Notice To Defend

| NOTICE | AVISO |
|---|---|
| | USTED HA SIDO DEMANDAMO/A EN LA CORTE. |
| YOU HAVE BEEN SUED IN COURT. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by | Si usted desea defender contra las demandas puestas en las siguientes páginas, usted tiene que tomar acción dentro de veinte (20) días después que esta demanda y Aviso es servido, con entrando por escrito una apariencia personalmente o por un abogado y |

Case ID: 110903694

attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.

Lawyer Referral and Information Service
Philadelphia Bar Association
1101 Market Street – 11th Floor
Philadelphia, PA 19107
(215) 238-1701

archivando por escrito con la Corte sus defensas o objeciones a las demandas puestas en contra usted. Usted es advertido que si falla de hacerlo el caso puede proceder sin usted y una sentencia puede ser entrado contra usted por la Corte sin más aviso por cualquier dinero reclamado en la Demanda o por cualquier otro reclamo o alivio solicitado por el Demandante. Usted puede perder dinero o propiedad o otros derechos importantes para usted.

LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VIYA EN PERSONA OR LLAME POR TELÉFONO A LA OFICINA CUYA DIRECCIÓN SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.

ASOCIACIÓN DE LICENCIADOS DE FILADELFIA
SERVICIO DE REFERENCIA E INFORMACIÓN LEGAL
1101 Market Street – 11th Floor
Philadelphia, PA 19107
(215) 238-1701

Case ID: 110903694

Adam D. Peavy, Esq.
apeavy@bpblaw.com
W. Harris Junell, Esq.
hjunell@bpblaw.com
T. Scott Allen, Esq.
sallen@bpblaw.com
**BAILEY PERRIN BAILEY**
440 Louisiana Street, Suite 2100
Houston, TX 77002
Telephone: (713) 425-7100
Facsimile: (713) 425-7101



Rosemary Pinto, Esq.
RPinto@feldmanpinto.com
**FELDMAN & PINTO**
1604 Locust Street, FL 2R
Philadelphia, PA 19103
Telephone: (215) 546-4385

*Attorneys for Plaintiff(s)*

This Is Not An Arbitration Case.
An Assessment of Damages Is
Required.

| | |
|---|---|
| **Joseph Cammarota, a Minor, by Amy Lynn Hallock, Guardian, and Amy Lynn Hallock, Individually**<br>4 Almadera Drive<br>Wayne, NJ 07470 ) | COURT OF COMMON PLEAS<br>TRIAL DIVISION<br>PHILADELPHIA COUNTY |
| Plaintiffs, ) | SEPTEMBER 2011 TERM |
| vs. ) | NO.: _____ |
| **SmithKline Beecham Corporation d/b/a GlaxoSmithKline**<br>One Franklin Plaza<br>Philadelphia, PA 19102-1225 ) | IN RE PAXIL PREGNANCY<br>CASES |
| Defendant. ) | JURY TRIAL DEMANDED |

### CIVIL ACTION SHORT-FORM COMPLAINT
### FOR PAXIL PREGNANCY CASES

Pursuant to the Order by the Honorable Paul P. Panepinto, Philadelphia County Court of

Common Pleas, the following Short Form Complaint is utilized in this mass tort action for cases

Case ID: 110903694

alleging that a child suffers from a congenital birth defect, from Persistent Pulmonary Hypertension of the Newborn ("PPHN"), or other related or similar conditions, as a result of the child's mother ingesting the prescription medication Paxil, Paxil OS or Paxil CR ("Paxil") during her pregnancy (hereinafter "Paxil Pregnancy Cases"). Plaintiff(s) select(s) and indicate(s) the causes of action raised in his/her/their case by checking off the appropriate spaces corresponding to the causes listed herein. In the event that a cause not listed herein is being raised, or where a claim requires, pursuant to Pennsylvania law, specific pleading or case-specific facts, Plaintiff(s) shall add and include said cause or said pleading or facts by way of submitting a Supplemental Short Form Complaint as approved by the Court's Case Management Order.

1.    Plaintiff **Joseph Cammarota**, a Minor, by **Amy Hallock,** Guardian(s), against GSK.

2.    A.    Minor Plaintiff

        Name:               **Joseph Cammarota**

        Place of Birth:      **New Jersey**

        State of Residence:  **New Jersey**

        Date of Birth:       **May 30, 2000**

        Date of Death:      **N/A**

    B.    Guardian for Minor Plaintiff:

        Name:               **Amy Lynn Hallock**

        State of Residence:  **New Jersey**

        Relationship to Minor Plaintiff:    **Mother**

    C.    Mother of Minor Plaintiff, Individually:

        Name:               **Amy Lynn Hallock**

State of Residence:   **New Jersey**

D.   Father of Minor Plaintiff, Individually:

Name:

State of Residence:

E.   Wrongful Death Beneficiaries and/or Personal Representative of Estate of

Minor Plaintiff, Deceased.

Name:   **N/A**

State of Residence:

Name:

State of Residence:

3.   Minor Plaintiff's mother ingested the following drugs relevant to this action for

the described period.

Paxil                          __X__
Paxil CR                       _____
Paxil Oral Suspension          _____

Dose (if known):              **Paxil 20-30mg**

Reason for prescription (if known):   **Anxiety / Depression**

4.   The prescribing physician was:     **Dr. David Gallina**

5.   Minor Plaintiff was born with / developed the following condition(s):

**Total anomalous pulmonary vein return (TAPVR), pulmonary hypertension
and Paxil withdrawal (surgery)**

6.   Plaintiff(s) are individual(s) residing in (city and state) **Wayne, New Jersey** and

claim(s) damages as a result of his/her/their mother's ingestion of Paxil during her

pregnancy.

7.   The following claims are asserted herein:

    __X__    Count One:      Breach of Express Warranty

    __X__    Count Two:      Breach of Implied Warranty

    __X__    Count Three:    Fraud

    __X__    Count Four:     Intentional Infliction of Emotional Distress

    __X__    Count Five:     Loss of Consortium

    __X__    Count Six:      Negligence

    __X__    Count Seven:    Negligence Per Se

    __X__    Count Eight:    Negligent Pharmacolvigilance

    __X__    Count Nine:     Failure to Warn

    __X__    Count Ten:      Negligent Misrepresentation

    __X__    Count Eleven:   Punitive Damages

    __X__    Count Twelve:   Strict Products Liability and/or Violation of [Applicable State's Products Liability Act]

    _____    Count Thirteen:  Survival/Survivorship Action

    _____    Count Fourteen:  Violation of [Applicable State's Consumer Act]

    _____    Count Fifteen:   Wrongful Death

    __X__    Count Sixteen:   Loss of Income

    __X__    Count Seventeen: Medical Expenses

    __X__    Count Eighteen:  Design Defect

Respectfully Submitted,

DATED: September 29, 2011

Adam D. Peavy (P.S.B.#205327)
apeavy@bpblaw.com
W. Harris Junell, Esq.
hjunell@bpblaw.com
T. Scott Allen, Esq.
sallen@bpblaw.com
**BAILEY PERRIN BAILEY**
440 Louisiana Street, Suite 2100
Houston, TX 77002
Telephone: (713) 425-7100
Facsimile: (713) 425-7101

Rosemary Pinto (PSB #53114)
RPinto@feldmanpinto.com
**FELDMAN & PINTO**
1604 Locus Street, FL 2R
Philadelphia, PA 19103
Telephone: (215) 546-4385

### ATTORNEYS FOR PLAINTIFFS

If additional counts are alleged, the specific facts supporting these
allegations must be pleaded by the plaintiff in the manner
complying with the requirements of the Pennsylvania Rules of
Civil Procedure on a Supplemental Short Form Complaint attached
to this Short Form Complaint.

Case ID: 110903694

# The Valley Hospital

**GENCY DEPARTMENT**
/4706552

| MED REC: | 10/24/99 | -10/24 |
| DATE: | T-2003 | 5-2019 |
| TIME: | | |

**PATIENT NAME & ADDRESS**
HALLOCK, AMY LYNN

PHONE

| AGE | SEX | MS |
| 26 | F | M |

**RELATIVE, FRIEND, PARENT OR GUAR**
CANNARUTA, PIETRO

**DATE OF BIRTH**   **PLACE OF BIRTH**
04/12/73

...30 0262

HUSBAND

**RESPONSIBLE PARTY**
BLUNJ-ID   VHC152703419   Fin.Cl: J

| EM-Basis | 7420011 |
| -Inter. | 7420012 |
| -Adm./Md3 | 7420013 |
| -Adm./CC | 7420014 |
| B.O. CODE | |

REL:   B.S.=

**TO BE SEEN BY**
ER   ER
E(201)447-8300 F

**FAMILY DOCTOR**
ASIM

**BROUGHT BY** | **PMH: ANXIETY** | **ALLERGIES**
FV | | 4-5 wks pregnant

**IF ACCIDENT, WHERE, WHEN, HOW INJURED. IF ILLNESS DESCRIBE FIRST AID TREAT**

RU: VOMITING ALL DAYS
ALSO C/O ABDOMINAL PAIN WHICH IS GETTING WORSE
TODAY, DENIES DIARRHEA GIVEN MEDS, BY PMD STATES NOT
MED: PAXIL

**LMP: SLP 1ST WEEK**

WEIGHT:
Pulse ox = 100%

**VISUAL ACUITY:**
100   OS   OD

114/85   89   98.0   18
B.P.   P.   T.   R.R.   R.

SIGNATURE:

**ADD'L HISTORY – PHYSICAL FINDINGS:**

Medication allergies: SULFA, TETANUS, PREDNISON
Food allergies:   NKA   CC – Pt complaining of having nausea and vomiting
Other allergies:   NKA   for 11 days.
Latex allergy:   N   HPI – Pt is about 4-5 weeks pregnant. Pt has bee
nauseated and has been vomiting for the past 11 days. Pt given
suppositories which burned and did not help. Pt given pills which
seemed to cause her to vomit. No fever or chills. Pt has been
urinating but less frequently and the urine is dark. No fever or chills.
First pregnancy.
PAST – Duodenitis
MEDS – Paxil
ALL – SULFA, TETANUS, PREDNISONE
PE – Pt resting on stretcher. Pt is awake and alert. Eyes- PERLA, EOM
intact. Neck- supple. Heart- RSR, NO M. Lungs - Clear to P&A. No
rales or rhonchi. No wheezes. No rales. Heart- RSR, NO M. Lungs - Clear
to P&A. No rales or rhonchi. No wheezes. Abdomen- soft, NO LKS enalrge
NO rebound or guarding. NO CVA tenderness. Tenderness in the epigastriu
Mild tenderness in the RUQ. No pain in the lower abdomen. Skin- warm and dry.

DX: VOMITING OF PREGNANCY. DEHYDRATION

| LAB: | |
| CBC | ✓ |
| CHEM-7 | |
| URINALYSIS | |
| URINE C & S | |
| CARDIAC | |
| OTHER | |
| LAB CALLED | DRAWN |

MONITOR:

X-RAY:

**TETANUS TOXOID** YES ☐ NO ☐   **TETANUS, DIPTHERIA BOOSTER** YES ☐ NO ☐

MFG. _____ LOT# _____ SITE: _____ INFO SHEET YES ☐ NO ☐ SIGNATURE _____
The wound was closed with ___ -0 ___ subcutaneous sutures and ___ -0 ___ skin sutures. Sutures are to be removed in ___ days by PMD.

**CONDITION ON DISCHARGE:** _____ **DISPOSITION:** _____ **TIME:** _____

**NURSE'S SIGNATURE** _____   **PHYSICIAN'S SIGNATURE** _____

CONSENT: I have sought care of the Valley Hospital Emergency Department for the purpose of receiving emergency medical care, treatment and/or diagnosis. I hereby grant permission for the

Amy   Hallock

10/12/98

76 YO wt   pregnant or
- nauseated   X 7 weeks
- vomity
- weak                    Depression          Anxiety

Paxil sve 5/98    -irritable           - CP
Prozac sve       - rageful            - palps
20-40 d/c 5/95   - slap ok            - SOB
                 - grab the ot        - ⊖ tingling.
EtOH - ⊘         - sex/dk beh         ⊖ den
Dig - ⊘          - sleep day day
                 - hit's belly
PmH:            - throws stuff —
                          Lisa —
Meds = Paxil    sen: to sounds, smells,
Alt - Sulfa, Prednisone,  people
     Tetanus Toxoid  - tough thin
                  - home alone, anxious

Case ID: 110903694

## PRENATAL RECORD

| Hospital | | District | | | | | Date |
|---|---|---|---|---|---|---|---|
| Valley | | | Asimalopulos | | | | 10/26/99 |
| Hosp. No. | | Office No. | Insurance | | | | |

N J B S

| Pt. Name | | Age | Race | Relig. | Country of Birth | Occupation |
|---|---|---|---|---|---|---|
| Amy Hallock | | 26 | W. | Christian | USA | education |
| Address | | | Marital Status S. M. W. D-Sep. | M | Years Married | |

| Name of Father of Child: | | Age | Ht. | Wt. | Significant disease | |
|---|---|---|---|---|---|---|
| Peter Gammarota | | 28 | | | | |
| Business Address | | Business Phone | | Occupation | | Education |

FAMILY HISTORY (Tbc, Hypertension, Heart D., Diabetes, Nervo-Psych, Epilepsy, Allergies, Mult. Births, Congenital Anom.)

| MENSTRUAL HISTORY Onset at | | | Interval | Duration | | Amt. |
|---|---|---|---|---|---|---|
| | | Via | 28 Days | | | Days |
| Months Preg. Attempted | L.M.P. 1st week Sept. | | Normal? | | F.B.C. | |

| PRIOR MEDICAL HISTORY | Yes. | Remarks (Include date and time of Rx) | HISTORY SINCE LAST MENSTRUAL PERIOD | Yes. | Remarks (Include date and time of Rx) |
|---|---|---|---|---|---|
| Kidney Disease | | anxiety | Nausea | | |
| Heart Disease | | | Vomiting | | |
| Hypertension | | | Indigestion | | |
| Rheumatic Fever | | | Constipation | | |
| Tuberculosis | | | Headache | | |
| Venereal Disease | | | Bleeding (Specify) | | |
| Gyn. Disorder | | | Vaginal Discharge | | |
| German Measles | | rubella immune 10/29/99 | Edema | | |
| Nervous & Mental | | | Abdominal Pain | | |
| Diabetes | | | Urinary Complaints | | |
| Thyroid Dysfunction | | | German Measles | | |
| Phlebitis, Varicosities | | | Other Virus | | |
| Epilepsy | | | Radiation (Specify) | | |
| Drug Sensitivity | | Celfa prednisone | Accidents | | benzll prednisone allergic |
| Allergies | | | Medications | | |
| Blood Dyscrasia | | | alcohol | | |
| Blood Transfusions | | | smoking | | |
| Rh, ABO Sensitivity | | | drugs | | |
| Operations, Accidents | | Hemophilia Clef Lip | cats | | |
| chickenpox | | | | | |

| SUMMARY OF PREVIOUS PREGNANCIES | | Full Term | Premature | Abortion | New Alive | Mult. Births |
|---|---|---|---|---|---|---|

| No. | Year | Place of Confinement | Dur. of Gestation | Dur. of Labor | Type of Delivery | Born A or D | Weight | Complications Maternal | Child |
|---|---|---|---|---|---|---|---|---|---|
| | | | x | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

Case ID: 110903694

Adam D. Peavy, Esq.
apeavy@bpblaw.com
W. Harris Junell, Esq.
hjunell@bpblaw.com
T. Scott Allen, Esq.
sallen@bpblaw.com
**BAILEY PERRIN BAILEY**
440 Louisiana Street, Suite 2100
Houston, TX 77002
Telephone: (713) 425-7100
Facsimile: (713) 425-7101

Rosemary Pinto, Esq.
RPinto@feldmanpinto.com
**FELDMAN & PINTO**
1604 Locus Street, FL 2R
Philadelphia, PA 19103
Telephone: (215) 546-4385

*Attorneys for Plaintiff(s)*



This Is Not An Arbitration Case.
An Assessment of Damages Is
Required.

| | |
|---|---|
| **Joseph Cammarota, a Minor, by Amy Lynn Hallock, Guardian, and Amy Lynn Hallock, Individually**<br>4 Almadera Drive<br>Wayne, NJ 07470<br><br>Plaintiffs,<br><br>vs.<br><br>**SmithKline Beecham Corporation d/b/a GlaxoSmithKline**<br>One Franklin Plaza<br>Philadelphia, PA 19102-1225<br><br>Defendant. | COURT OF COMMON PLEAS<br>TRIAL DIVISION<br>PHILADELPHIA COUNTY<br><br><br>SEPTEMBER 2011 TERM<br><br>NO.: _____<br><br>IN RE PAXIL PREGNANCY<br>CASES |

## VERIFICATION

I, **Adam D. Peavy**, hereby state:

1.    I represent the Plaintiff(s) in this action;

2.     I verify that the statements made in the foregoing Civil Action Short-Form

Complaint are true and correct to the best of my knowledge, information and belief, and;

3.     I understand that the statements in the foregoing Civil Action Short-Form

Complaint are made subject to the penalties of 18 PA. C.S.A. §4904 relating to the unsworn

falsification to authorities.

Date: _____9/29_____, 2011.         _____
                                         Adam Peavy, Esq.

# Exhibit C

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

THOMAS MONROE, JR.                        :
and ALVINIA MONROE                        :
                                          :
                 Plaintiffs               :        CIVIL ACTION
                                          :
        vs.                               :        No. 10-cv-02140
                                          :
SMITHKLINE BEECHAM CORPORATION,           :
d/b/a GLAXOSMITHKLINE; and                :
GLAXOSMITHKLINE LLC,                      :
                                          :
                 Defendants.              :

ORDER

AND NOW, this      20th      day of July, 2010, upon

consideration of Defendants' Motion for Relief from Order (Doc.

No. 16), Plaintiffs' Response in Opposition to Defendants' Motion

for Relief (Doc. No. 8) and Defendants' and Plaintiffs' responses

thereto, Defendants' request to reconsider our decision remanding

this case to the Philadelphia Count Court of Common Pleas shall

be GRANTED.[1]

_____

[1]     Under Federal Rule of Civil Procedure 60(b)(1) a district court "may
relieve a party or its legal representative from a final judgment, order, or
proceeding" for a "mistake" providing the party has submitted a motion for
relief within one year of the order. The decision as to whether or not to
grant a Rule 60(b) motion is entirely within a district court's discretion.
Ross v. Meagan, 638 F.2d 646, 648 (3d Cir. 1981). Motions for relief brought
under Rule 60(b) are treated the same way as motions to reconsider. See Nash
v. Twp. of Haverford Dept. of Codes Enforcement, 2007 U.S. Dist. Lexis 67265,
*12-13 (E.D. Pa. 2007).

        A motion to reconsider is meant to "correct manifest errors of law or
fact or to present newly discovered evidence." Harsco Corp. v. Zlotnicki, 779
F.2d 906, 909 (3d Cir. 1985). The party moving for reconsideration must base
his motion on one of the following grounds: "(1) an intervening change in
controlling law; (2) the availability of new evidence [not available
previously]; [or] (3) the need to correct clear error [of law] or prevent
manifest injustice." North River Ins. Co. v. Cigna Reinsurance Co., 52 F.3d
1192, 1218 (3d Cir. 1995). A motion to reconsider may address only factual or
legal matters that the court may have over looked; therefore, "it is improper
on a motion for reconsideration to ask the court to rethink what it already

·Pursuant to this order, the Court will now consider

Defendant's Motion to Transfer (Doc. No. 2), and the parties are

hereby GRANTED seven (7) days from the entry of this order to

file any supplemental briefs concerning Defendant's Motion to

Transfer that they deem appropriate.

By the Court:

s/J. Curtis Joyner
J. Curtis Joyner, J.

---

thought through - rightly or wrongly." Glendon Energy Co. v. Borough of
Glendon, 836 F. Supp. 1109, 1122 (E.D. Pa. 1993].

Typically, "a district court loses jurisdiction over a case once it has
completed the remand·by sending a certified copy of the remand order to the
state court." Trans Penn Wax Corp. v. McCandless, 50 F.3d 217, 225. However,
a district court may "reconsider its order of remand" if "the initial remand
was not covered by [28 U.S.C.] § 1447(c]" as "the bar of [28 U.S.C.] §
1447(d) is . . . not implicated. Id. at 228. ·Federal courts are
"precluded by section 1447(d) from reviewing remand orders based on routine
jurisdictional determinations, but [they] may review untimely remand orders
that are based on procedural defects." Korea Exch. Bank v. Trackwise Sales
· Corp., 66 F.3d 46, 48 (3d Cir. 1995] (internal quotations omitted). A party's
noncompliance with § 1441(b) is an example of a procedural defect. Id. at 51-
52. Therefore, a motion to remand based on a § 1441(b) violation must be
filed within 30 days of removal. Id.

In as much as Defendant's failed to timely file their response to
Plaintiffs' remand motion and did not raise the time-bar until the filing of
·their amended response, we were not caused to calculate the number of days
between removal and the motion filing date. That failure, however,
constituted error on our part. Now that the matter has been brought to our
attention, we find that Plaintiff's Motion to Remand was filed thirty-one days.
after Defendant's removal. Thus, the Court's remand was not covered by §
1447(c), and as a result, we may reconsider our original order remanding this
case to the Philadelphia County Court of Common Pleas. A district court does
not have statutory authority to remand a case because of a procedural defect
when a plaintiff has filed his motion to remand more than thirty days after
removal, even if he filed the motion on the thirty-first day. Air-Shields,
Inc. v. Fullam, 891 F.2d 63, 66 (3d Cir. 1989]; Ramos v. Quien, 631 F. Supp.
2d 601, 600 (E.D. Pa. 2008]. Again, Plaintiffs filed their Motion to Remand
on June 10, thirty-one days after Defendants removed the case on May 10.
Consequently, the Court improperly remanded this case.

# Exhibit D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ISAIAS COLON MALDONADO, a Minor, by Frances Maldonado and Wilmaris Colon Montes, as Parents and Natural Guardians, | : : : : : | |
| vs. | : : | |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE | : : : : | Civil Action No.: 11-2812 |
| JASMINE CALDWELL, a Minor, by Denine Caldwell and Jason Caldwell, as Parents and Natural Guardians, | : : : : | |
| vs. | : : | |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE | : : : : : | Civil Action No.: 11-2813 |
| JESSE DEWITT, a Minor, by Summer Jenkins, as Parent and Natural Guardian, | : : : | |
| vs. | : : | |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE | : : : : : | Civil Action No.: 11-2814 |
| ELIZABETH SEDLACEK, a Minor, by Robin Lucas, as Parent and Natural Guardian, | : : : | |
| vs. | : : | |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE | : : : : : | Civil Action No.: 11-2815 |

| | |
|---|---|
| **CHARLES STOKES, a Minor, by Wendy Springer, as Parent and Natural Guardian,** : | |
| : | |
| **vs.** : | |
| : | |
| **SMITHKLINE BEECHAM** : | **Civil Action No.: 11-2816** |
| **CORPORATION d/b/a** : | |
| **GLAXOSMITHKLINE** : | |
| : | |
| : | |
| **VICTORIA CHANDLER, a Minor, by Julie L. Hill, as Parent and Natural Guardian,** : | |
| : | |
| **vs.** : | |
| : | |
| **SMITHKLINE BEECHAM** : | **Civil Action No.: 11-2817** |
| **CORPORATION d/b/a** : | |
| **GLAXOSMITHKLINE** : | |
| : | |
| : | |
| **JACOB VOORHEES, a Minor, by Tiffany Voorhees and Scott Voorhees, as Parents and Natural Guardians,** : | |
| : | |
| **vs.** : | |
| : | |
| **SMITHKLINE BEECHAM** : | **Civil Action No.: 11-2818** |
| **CORPORATION d/b/a** : | |
| **GLAXOSMITHKLINE** : | |
| : | |
| : | |
| **PATRICK WELSH, a Minor, by Barbara Welsh, as Parent and Natural Guardian,** : | |
| : | |
| **vs.** : | |
| : | |
| **SMITHKLINE BEECHAM** : | **Civil Action No.: 11-2819** |
| **CORPORATION d/b/a** : | |
| **GLAXOSMITHKLINE** : | |
| : | |
| : | |

ii

| | |
|---|---|
| **MASON JASON YUEILL, a Minor, by** Michael J. Yueill, et al., | : |
| | : |
| | : |
| **vs.** | : |
| | : |
| **SMITHKLINE BEECHAM** **CORPORATION d/b/a** **GLAXOSMITHKLINE** | : **Civil Action No.: 11-2820** |
| | : |
| | : |
| | : |
| **MARION HOPE CHANDLER, a Minor,** **by Julie L. Hill, as Parent and Natural** **Guardian,** | : |
| | : |
| | : |
| **vs.** | : |
| | : |
| **SMITHKLINE BEECHAM** **CORPORATION d/b/a** **GLAXOSMITHKLINE** | : **Civil Action No.: 11-2821** |
| | : |
| | : |
| | : |
| **NAOMI CHANDLER, a Minor, by** **Trenice Chandler, et al.,** | : |
| | : |
| **vs.** | : |
| | : |
| **SMITHKLINE BEECHAM** **CORPORATION d/b/a** **GLAXOSMITHKLINE** | : **Civil Action No.: 11-2822** |
| | : |
| | : |
| | : |
| **SAMUEL NOAH ELLISON, a Minor, by** **Julia Ann Ellison, as Parent and Natural** **Guardian,** | : |
| | : |
| | : |
| **vs.** | : |
| | : |
| **SMITHKLINE BEECHAM** **CORPORATION d/b/a** **GLAXOSMITHKLINE** | : **Civil Action No.: 11-2823** |
| | : |
| | : |

| | | |
|---|---|---|
| KYLA HODNETT, a Minor, by Eve<br>Hodnett, as Parent and Natural Guardian,<br><br>vs.<br><br>SMITHKLINE BEECHAM<br>CORPORATION d/b/a<br>GLAXOSMITHKLINE | : : : : : : : : : : : | **Civil Action No.: 11-2824** |
| ROSS ANGELY PORTALATIN-<br>MENDEZ, a Minor, by Carmen M.<br>Mendez-Maldonado and Juan Portalatin,<br>as Parents and Natural Guardians,<br><br>vs.<br><br>SMITHKLINE BEECHAM<br>CORPORATION d/b/a<br>GLAXOSMITHKLINE | : : : : : : : : : : : | **Civil Action No.: 11-2825** |
| SARAH WATTS, a Minor, by Lester<br>Watts and Tammy Watts, as Parents and<br>Natural Guardians,<br><br>vs.<br><br>SMITHKLINE BEECHAM<br>CORPORATION d/b/a<br>GLAXOSMITHKLINE | : : : : : : : : : : : | **Civil Action No.: 11-2826** |
| ALLISON KEEFE, a Minor, by Cynthia<br>Keefe and Stanley A. Keefe, as Parents<br>and Natural Guardians,<br><br>vs.<br><br>SMITHKLINE BEECHAM<br>CORPORATION d/b/a<br>GLAXOSMITHKLINE | : : : : : : : : : : : | **Civil Action No.: 11-2827** |

| | | |
|---|---|---|
| **JENNIFER SCHAFFTER, a Minor, by Debra Petty, as Parent and Natural Guardian,** | : | |
| | : | |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : | **Civil Action No.: 11-2828** |
| | : | |
| | : | |
| | : | |
| | : | |
| **BROOKE BABICH, a Minor, by Bruce Babich, as Parent and Natural Guardian,** | : | |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : | **Civil Action No.: 11-2829** |
| | : | |
| | : | |
| | : | |
| **ARIANNA SMART, a Minor, by Angela Smart, et al.,** | : | |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : | **Civil Action No.: 11-2830** |
| | : | |
| | : | |
| | : | |
| **MASON ANDREW STEINBECK, a Minor, by Mikelann Steinbeck, as Parent and Natural Guardian,** | : | |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : | **Civil Action No.: 11-2831** |
| | : | |
| | : | |

:

| | |
|---|---|
| **TANNER A. WIELAND, a Minor, by** | : |
| **Christina Wieland, et al.** | : |
| | : |
| **vs.** | : |
| | : |
| **SMITHKLINE BEECHAM** | : |
| **CORPORATION d/b/a** | :    **Civil Action No.: 11-2832** |
| **GLAXOSMITHKLINE** | : |
| | : |
| | : |

### DEFENDANT GLAXOSMITHKLINE LLC'S, FORMERLY SMITHKLINE BEECHAM CORPORATION D/B/A GLAXOSMITHKLINE'S OPPOSITION TO PLAINTIFFS' MOTION TO REMAND

vi

## TABLE OF CONTENTS

I.       INTRODUCTION ................................................................................................. 1

II.      FACTUAL BACKGROUND ............................................................................... 5

  A.     SmithKline Beecham Corporation Converted into GlaxoSmithKline LLC ("GSK
         LLC") to Help Facilitate HIV/AIDS Research and Development. ......................... 5

  B.     GlaxoSmithKline LLC Was Formed as a "Manager-Managed" LLC. ................. 7

  C.     GlaxoSmithKline Holdings (Americas) Inc. ("GSK Holdings") Is a Holding
         Company, and Its Functions Are Narrow and Straightforward............................. 9

  D.     GSK Holdings Performs Its Limited Functions as a Holding Company in
         Quarterly and Special Meetings Held in Delaware. ........................................... 11

III.     ARGUMENT AND CITATIONS TO AUTHORITY ......................................... 17

  A.     Plaintiffs' Motion To Remand Should Be Denied Because GSK LLC Is A
         Citizen Of Delaware, Not Pennsylvania. ........................................................... 17

    1.   The Court Should Reconsider the New Citizenship Rule Set Forth in Brewer in
         Light of the Fact that GSK LLC Was Formed as a "Manager-Managed" LLC. .. 17

    2.   GSK Is a Citizen of Delaware Alone Because Its "Nerve Center" Is in
         Delaware. ........................................................................................................ 22

    3.   As Shown by the Supplemented Record, Any Suggestion That GSK Holdings Is
         an "Artifice to Manipulate Jurisdiction" is Misplaced. ..................................... 26

    4.   Plaintiffs Rely on Irrelevant Facts and Inapposite Authority............................ 28

  B.     Although Delaware Remains GSK Holdings' "Nerve Center," Strategic Input
         Emanating From Outside of Delaware Comes From London –
         Not Philadelphia. ............................................................................................. 30

  C.     SmithKline Beecham Corporation Was Converted into GSK LLC and Cannot Be
         Sued as a Dissolved Corporation....................................................................... 32

    1.   SmithKline Beecham Corporation Did Not Dissolve Under
         Pennsylvania Law. ........................................................................................... 32

    2.   Plaintiffs' Interpretation Is Inconsistent with the Purpose of the Pennsylvania
         Survival Statute................................................................................................ 34

  D.     This Court Should Certify the Issue for Interlocutory Appeal............................ 35

IV.      CONCLUSION ................................................................................................. 36

## TABLE OF AUTHORITIES

Page(s)

**CASES**

*212 Marin Blvd., LLC v. Chi. Title Ins. Co.*
No. 09-6366, 2010 U.S. Dist. LEXIS 82589 (D.N.J. July 8, 2010)........................................29

*Am. Optical Co. v. Philadelphia Elec. Co.*
228 F. Supp. 293 (E.D. Pa. 1964).......................................................................................35

*Bartram, LLC v. C.B. Contrs., LLC*
No. 1:09-cv-254-SPM/AK, 2010 U.S. Dist. LEXIS 92008 (N.D. Fla. Aug. 10, 2010) .........19

*Bowen Med. Co. v. Nicolet Biomedical, Inc.,*
No. 02-1070, 2002 U.S. Dist. LEXIS 27155 (W.D. Wis. Nov. 14, 2002)..............................32

*Brewer v. SmithKline Beecham Corp.,*
No. 2:10-cv-04443-GP, 2011 U.S. Dist. LEXIS 31149 (E.D. Pa. Mar. 24, 2011).......... passim

*Carden v. Arkoma Assocs.*
494 U.S. 185 (1990)..........................................................................................................18

*Cent. W. Va. Energy Co, Inc. v. Mountain State Carbon, LLC*
No. 10-1486, 2011 U.S. App. LEXIS 7557 (4th Cir. Apr. 13, 2011).....................................25

*Comerica Bank v. Merriweather Rd. Ltd.*
No. 09-13497, 2010 U.S. Dist. LEXIS 49285 (E.D. Mich. May 19, 2010).............................29

*De Walker v. Pueblo Int'l, Inc.*
569 F.2d 1169 (1st Cir. 1978)............................................................................................21

*EverNu Tech., LLC v. Rohm & Haas Co.,*
No. 10-2635, 2010 U.S. Dist. LEXIS 88921 (E.D. Pa. Aug. 26, 2010).................................21

*F.P. Woll & Co. v. Fifth & Mitchell St. Corp.*
No. 96-CV-5973, 2001 U.S. Dist. LEXIS 24050 (E.D. Pa. Dec. 13, 2001)...........................34-35

*Glenn Seed, Ltd. v. Vannet*
No. 09-309, 2009 U.S. Dist. LEXIS 93739 (W.D. Wis. Oct. 7, 2009)..............................31-32

*Gray v. Hawkeye Construction Co. LLC*
No. 10-1056, 2010 U.S. Dist. LEXIS 110194 (S.D. W. Va. Oct. 15, 2010)...........................30

*Great Lakes Transmission L.P. v. Essar Steel Holdings Minnesota, LLC*
No. 09-3037, 2010 U.S. Dist. LEXIS 2969 (D. Minn. Jan. 14, 2010)...................................31

*Hart v. Terminex Int'l*
   336 F.3d 541 (7th Cir. 2003) ............................................................................................. 18

*Hertz Corp. v. Friend,*
   130 S. Ct. 1181 (2010) ............................................................................................... passim

*Hoch v. Eli Lilly & Co.*
   736 F. Supp. 2d 219 (D.D.C. 2010) ........................................................................ 1, 23, 33

*Holly Farms Corp. v. Taylor*
   722 F. Supp. 1152 (D. Del. 1989) ..................................................................................... 21

*In re Hydroxycut Mktg. and Sales Practices Litig.*
   No. 09MD2087-BTM, 2010 U.S. Dist. LEXIS 76751 (S.D. Cal. July 29, 2010) ................. 31

*J.A. Olsen v. City of Winona, Miss.*
   818 F.2d 401 (5th Cir. 1987) ............................................................................................ 21

*Kelly v. United States Steel Corp.*
   284 F.2d 850 (3d Cir. 1960) ....................................................................................... 29-30

*MAS Capital, Inc. v. Biodelivery Sciences Int'l*
   524 F.3d 831 (7th Cir. 2008) ............................................................................................ 31

*Mennen Co. v. Atl. Mut. Ins. Co.*
   147 F.3d 287 (3d Cir. 1998) ............................................................................................. 28

*Quaker State Dyeing & Finishing Co., Inc. v. ITT Terryphone Corp.*
   461 F.2d (3d Cir. 1972) .................................................................................................... 21

*Schwartz v. Elec. Data Sys., Inc.*
   913 F.2d 279 (6th Cir. 1990) ............................................................................................ 21

*Stewart v. Precision Airmotive Corp.*
   No. 07-1610, 2007 U.S. Dist. LEXIS 74194 (E.D. Pa. Oct. 3, 2007) ............................. 21-22

*Torres v. Southern Peru Copper Corp.*
   113 F.3d 540 (5th Cir. 1997) ............................................................................................ 31

*Topp v. CompAir, Inc.*
   814 F.2d 830 (1st Cir. 1987) ....................................................................................... 21, 22

*White v. SmithKline Beecham Corp.*
   No. 10-2141, 2010 U.S. Dist. LEXIS 79520 (E.D. Pa. Aug. 5, 2010) ........................... passim

*Zambelli Fireworks Mfg. Co., Inc. v. Wood*
   592 F.3d 412 (3d Cir. 2010) ........................................................................................ passim

### STATUTES

6 Del. Code § 18-214.............................................................................................................7

6 Del. Code § 18-402.........................................................................................................7-8

8 Del. Code § 265(f)............................................................................................................34

8 Del. Code § 265(g)...........................................................................................................34

15 Pa. Cons. Stat. § 1977(b)...............................................................................................33

15 Pa. Cons. Stat. § 1980...............................................................................................32-33

15 Pa. Cons. Stat. § 1980 cmt.......................................................................................32-33

15 Pa. Cons. Stat. § 8959(a), (b).........................................................................................6

28 U.S.C. § 1331................................................................................................................28

28 U.S.C. § 1332(c) .....................................................................................................18, 28

28 U.S.C. § 1338................................................................................................................28

28 U.S.C. § 1441(b).............................................................................................................5

### OTHER AUTHORITIES

FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 2821 (2010) ...................9, 10

15 Moore's Fed. Prac. § 102.50 (3d ed. 2010).................................................................31

## I.   INTRODUCTION

Defendant GlaxoSmithKline LLC, formerly SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK LLC"), respectfully submits this Opposition to Plaintiffs' Motion to Remand and requests oral argument in the above consolidated case. As this Court is aware, a split now exists in this District on the issue of GSK LLC's citizenship. In August, Judge McLaughlin held that GSK LLC was a citizen of Delaware and denied remand on that basis. *White v. SmithKline Beecham Corp.*, No. 10-2141, 2010 U.S. Dist. LEXIS 79520 (E.D. Pa. Aug. 5, 2010); *see also Hoch v. Eli Lilly & Co.*, 736 F. Supp. 2d 219, 221 (D.D.C. 2010) (also holding that GSK was a citizen of Delaware). More recently, and in contrast to these decisions, this Court found that GSK LLC was a citizen of Pennsylvania in *Brewer v. SmithKline Beecham Corp.*, No. 2:10-cv-04443-GP, 2011 U.S. Dist. LEXIS 31149, at *26 (E.D. Pa. Mar. 24, 2011).

GSK LLC respectfully submits that *Brewer* was incorrectly decided and asks the Court to reconsider its decision. The facts in all three of the above cases, and in the above-captioned cases, require application of two settled rules: (1) the citizenship of a limited liability company ("LLC") is determined by the citizenship of its members, *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412 (3d Cir. 2010); and (2) the citizenship of a corporation is determined by the "nerve center" test, *Hertz Corp. v. Friend*, 130 S. Ct. 1181 (2010). In *Brewer*, however, the Court "meld[ed]" these two rules together to create a new citizenship rule. *Brewer*, 2011 U.S. Dist. LEXIS 31149, at *24. Based on the perception that GSK LLC presented an "anomal[ous]" situation (*i.e.*, "a limited liability company whose sole member is a holding company that does not direct or control the operations of the limited liability company"), the Court fashioned a new rule in which courts would "look to the *'nerve center'* of the *limited liability company* to which the holding company has delegated the operational decision-making" in determining the holding company's principal place of business. *Id* at *5, *24 (emphasis added).

1

Because the Court sought to address what it perceived as a novel and unusual circumstance when it fashioned this new rule in *Brewer*, the record amassed at the time was not adequate to assist the Court in understanding some important and commonplace features of limited liability companies *qua* limited liability companies. Those features, GSK LLC urges now, might have pointed the Court in a different direction were they known to it at the time of *Brewer*. Most significantly, neither party had an opportunity to discuss with the Court the significance of GSK LLC's structure as a manager-managed limited liability company, which structure actually *precludes* the kind of delegation the Court thought justified its novel hybrid rule.

In asking the Court to reach a different conclusion here than it did in *Brewer*, GSK LLC respectfully supplements the record to address some of the factual issues that were identified in the *Brewer* decision. First, GSK submits the Declaration of Jonathan R. Macey, Professor of Corporate Law at Yale University (Ex. A), to show that the situation of a limited liability company whose sole member is a holding company -- a so-called "single-member LLC subsidiary" -- is relatively commonplace. In *Brewer*, the Court noted that its decision to create a new citizenship rule was based in part on "the unusual circumstances" presented by GSK LLC's relationship to GlaxoSmithKline Holdings (Americas) Inc. ("GSK Holdings"). *Id.* at *5. The Court further described GSK LLC's situation as an "atypical factual scenario," an "anomaly," and a "unique circumstance." *Id.* at *5, *24, *26. As shown in Professor Macey's Declaration, however, the structure and governance of GSK LLC and GSK Holdings are not atypical. Instead, single-member LLC subsidiaries are a widely accepted business structure, and there are sound business reasons why many holding companies employ them, including favorable tax treatment and flexibility in governance. Thus, the fact pattern presented by GSK LLC does not

2

warrant deviation from the straight-forward rules set forth in *Hertz* and *Zambelli*. Notably, the factual predicates for the Court's conclusions in *Brewer* all occurred *before* the Supreme Court announced the simple jurisdictional rule in *Hertz*. In addition, the possible effect of this Court's ruling in *Brewer* may not be limited to GSK and the facts of the *Brewer* cases, but instead has the potential to affect many other single-member LLCs.

Second, GSK presents evidence that GSK Holdings did not "delegate[] its rights and powers to manage and control the business and affairs of the limited liability company to LLC's directors and officers." *Id.* at *23. This perceived delegation was another reason that the Court gave for finding it necessary to "meld" the tests for LLCs and corporations set forth in *Zambelli* and *Hertz. Id.* at *27. As further explained by Professor Macey, however, there is a distinction between an LLC that was created as a "manager-managed" LLC and an LLC that was created as a "member-managed" LLC. While the Delaware code authorizes the member of a "member-managed" LLC to delegate to one or more persons its right to manage the business of the LLC, the members of a "manager-managed" LLC cannot so delegate because the members in a "manager-managed" LLC were never vested with such managerial duties in the first instance. GSK LLC's operating agreement confirms that GSK LLC was created as a "manager-managed" LLC, meaning that its member, GSK Holdings, was never vested with managerial responsibility for GSK LLC, and thus could not have delegated it to the managers of GSK LLC or to anyone else.

Third, GSK supplements the record in these cases by attaching the declarations of Mr. Donald McLamb and Mr. Victor G. Vogel. These two declarants address factual questions raised in the *Brewer* decision regarding GSK Holdings' operation as a holding company. In *Brewer*, the Court stated that GSK LLC's "post-discovery conduct in these cases smacks of

3

jurisdictional manipulation," citing changes to GSK Holdings' by-laws and to certain

government contracts. *Brewer*, 2011 U.S. Dist. LEXIS 31149, at *29-*30. Additionally, the

Court listed the by-laws and the government contracts as the first two factors in deciding that

GSK Holdings' "nerve center" was in Philadelphia. *Id.* at *33.

As the attached declarations show, however, these changes to the by-laws and

government contracts were not undertaken to alter the *facts* about where GSK Holdings kept its

office, books, and paper or the *facts* about which GSK entity was engaged in these government

contracts. This was neither the intent nor the effect of these changes. Instead, Mr. McLamb's

declaration shows that GSK Holdings amended its by-laws to reflect what had already been the

corporation's actual business practices for the past several years. Similarly, Mr. Vogel's

declaration shows that GSK LLC requested approval from the U.S. government to correct certain

government contracts to reflect that GSK LLC -- not GSK Holdings -- was the party to and the

entity that performed these contracts. In both of these instances, GSK Holdings and GSK LLC

have corrected these documents not to alter the facts about GSK Holdings' actual business

practices, but to correct those documents so that they accurately reflected the actual business

practices that were already being followed by GSK Holdings and GSK LLC.

In short, based on this supplemented record plus the facts that were already in the record

from *Brewer*, the parties in these cases are completely diverse because GSK LLC is solely a

citizen of Delaware and Plaintiffs are not citizens of Delaware.[1] Further, because GSK LLC is

---

[1] Plaintiffs' contention that "as of the date of filing, GSK was an active, domestic corporation with its principal place of business in Philadelphia according to the Pennsylvania Department of State", (Pls' Mot. at 1), is incorrect. The Pennsylvania Department of State document that Plaintiffs cite appears to refer to an entity named "GlaxoSmithKline" that was owned by SmithKline Beecham Corporation. (*See* Ex. 1 to Pls.' Mot.) The record is not for SmithKline Beecham Corporation itself and does not state that SmithKline Beecham Corporation is an active Pennsylvania corporation. (*See id.*) Moreover, Plaintiffs acknowledge two pages later that GSK converted from a Pennsylvania corporation into a Delaware limited liability company in 2009. (*See* Pls.' Mot. at 3 ("The termination of GSK's existence as a Pennsylvania corporation and its emergence as a Delaware limited liability company occurred on October 27, 2009.").) The Pennsylvania Department of State records correctly reflect this. (*See* May

4

not a citizen of Pennsylvania, removal is not barred by the forum-defendant rule set forth in 28

U.S.C. § 1441(b). GSK LLC therefore respectfully requests that the Court reconsider its

decision in *Brewer* and deny Plaintiffs' Motion to Remand in the above captioned cases. Finally,

GSK LLC asks that the Court certify its order denying remand for interlocutory appeal. *Brewer*

could not be appealed, and the Third Circuit should have a chance to review the split that now

exists in the Eastern District of Pennsylvania.

## II.   FACTUAL BACKGROUND

### A.   SmithKline Beecham Corporation Converted into GlaxoSmithKline LLC ("GSK LLC") to Help Facilitate HIV/AIDS Research and Development.

In October 2009, SmithKline Beecham Corporation d/b/a GlaxoSmithKline became a

limited liability company named GlaxoSmithKline LLC ("GSK LLC"). Previously, SmithKline

Beecham Corporation had been a corporation incorporated under Pennsylvania law. Then, on

October 27, 2009, SmithKline Beecham Corporation underwent two conversions. First, it

converted from a Pennsylvania corporation into a Delaware corporation. Second, on the same

day, it converted from a Delaware corporation into a Delaware limited liability company.

The purpose of this dual conversion was not to change its citizenship for jurisdictional

purposes, nor was it an attempt to place SmithKline Beecham Corporation beyond the reach of

any court's jurisdiction. Rather, the conversions were made so that SmithKline Beecham

Corporation's ultimate parent corporation could enter into a joint venture with Pfizer to research

and develop new treatments for HIV/AIDS. (Declaration of Julian Heslop ("Heslop Decl.") at ¶

5 (Ex. C); Heslop Dep. at 19-20 (Ex. D); Corrigan Dep. at 15-16 (Ex. E).) The new joint

venture, ViiV Healthcare ("ViiV"), was designed to provide particular focus and renewed

emphasis on both the sale and creation of innovative HIV/AIDS treatments in the United States

---

18, 2011 printout from Pennsylvania Department of State reflecting that GlaxoSmithKline LLC registered as a
Delaware limited liability company effective October 27, 2009 (Ex. B).)

5

and worldwide, in contrast to the efforts that had previously been conducted separately by GSK and Pfizer. (Heslop Decl. at ¶ 5; Heslop Dep. at 140-41.)

Formation of ViiV, however, required the separation of SmithKline Beecham's HIV assets from other GSK entities. (Heslop Decl. at ¶ 5.) This created two separate problems that, in turn, required solution by two, separate conversions. The first problem was that -- if SmithKline Beecham Corporation remained a corporation -- the transfer of its HIV business to ViiV would trigger a new tax liability that would run into the hundreds of millions of dollars. (Heslop Decl. at ¶ 5; Heslop Dep. at 18-20.) GSK Holdings and its parent companies would not have established the ViiV joint venture in the face of such a prohibitive tax. (Heslop Decl. at ¶ 5; Heslop Dep. at 19-20.) The solution to this problem was to convert SmithKline Beecham Corporation into a limited liability company or an LLC. In this entity form, under U.S. Internal Revenue Service rules, transfer of the HIV assets did not trigger the same tax liability, and the joint venture could go forward. (Heslop Dep. at 19-21, 139.)

This solution, however, presented another problem. Under Pennsylvania law, to convert into a LLC, SmithKline Beecham Corporation first would have to dissolve and actually wind down as a corporation. *See* 15 Pa. Cons. Stat. § 8959(a), (b) (the effect of such a conversion is to terminate the existence of the corporation and to vest the assets of the corporation in the surviving limited liability company). In addition to being an onerous process, termination of SmithKline Beecham Corporation would have caused a break in the continuity of the legal entity. Maintaining the continuity of the legal entity is important for a variety of reasons, chief among which are (a) avoiding complex effects on many third-party agreements that contained restrictions on transfer and assignment, and (b) not triggering issues related to ownership of intellectual property rights. (Heslop Decl. at ¶ 10; Heslop Dep. at 137-39.) In contrast to

6

Pennsylvania law, the problem of discontinuity did not exist for Delaware corporations. Under

Delaware law, converting from a corporation to a limited liability company may be done without

any break in the continuity of the legal entity. *See* 6 Del. Code § 18-214.

Consequently, the solution to these problems was a two-step process. SmithKline

Beecham Corporation first converted from a Pennsylvania corporation to a Delaware

corporation. This solved the continuity problem. Then, SmithKline Beecham Corporation

(newly incorporated under Delaware law) converted from a Delaware corporation to a Delaware

limited liability company -- GSK LLC. This prevented triggering the prohibitive tax liability.

With the twin issues of continuity and taxation resolved, GSK and Pfizer entered into their joint

venture, and the innovative ViiV since has had a successful start-up as an HIV/AIDS enterprise.

(Heslop Dep. at 140.)

## B.    GlaxoSmithKline LLC Was Formed as a "Manager-Managed" LLC.

Today, LLCs are a common business form recognized by every state in the country. (*See*

Macey Decl. at ¶ 20.) As described more fully in Professor Macey's declaration, state

legislatures first developed the concept of an LLC in the 1970s as a hybrid business organization

form that combines attractive characteristics of other business forms. (*See* Macey Decl. at ¶¶ 15-

18.) Since then, the LLC form has become widely used in this country. (*See id.* ¶¶ 19-21.) Last

year, in Delaware alone, approximately 82,600 new LLCs were formed. (*See id.* at ¶ 25)

Under Delaware's Limited Liability Company Act, an LLC can be managed either by its

members ("member-managed") or by managers ("manager-managed"). (*Id.* at ¶ 36.) The LLC's

operating agreement specifies whether the LLC is member-managed or manager-managed. (*Id.*)

If the LLC agreement provides for the management of an LLC by a manager, under Delaware

law, "the management of the [LLC], to the extent so provided, shall be vested in the manager."

7

Del. Code Ann. tit. 6, § 18-402. Otherwise, the management of the LLC is vested in its members. *Id.*

GSK LLC was formed as a manager-managed LLC under Delaware law. Pursuant to Delaware's Limited Liability Company Act, GSK LLC's operating agreement provides for the management of GSK LLC to be vested in a Board of Managers. (*See* Macey Decl. at ¶ 37.) The operating agreement states: "The business and affairs of the Company shall be managed by a Board of Managers (the "Board"), which shall consist of at least three persons (each such person, a "Manager")." (*See* GSK LLC Operating Agreement at § 4.1 (Ex. F).)

Consequently, as a member of a manager-managed LLC, GSK Holdings was never vested with management responsibility for GSK LLC, and therefore, could not have delegated those responsibilities to anyone else. Before October 27, 2009, the responsibility for managing the operations of SmithKline Beecham Corporation was vested in SmithKline Beecham Corporation, not in GSK Holdings. Upon the formation of GSL LLC as a manager-managed LLC, that operational responsibility was placed in the hands of GSK LLC's board of managers. Those operational responsibilities did not migrate up to GSK Holdings only to be delegated back down, because they never were vested in GSK Holdings at any time.

In addition to being a manager-managed LLC, GSK LLC was formed as a single-member LLC, which means that it is a wholly-owned subsidiary of another business entity. (*See* Macey Decl. at ¶¶ 32-34.) In this instance, GSK LLC's sole member is GSK Holdings, a corporation incorporated under Delaware law. This structure is widely accepted, (*see id.* at ¶¶ 32-33), and it is common for a holding company to establish a subsidiary that is a single-member LLC. (*See id.* at ¶ 32.) There are sound business reasons for adopting such a structure, having nothing to do

8

with federal jurisdiction, including both favorable tax treatment and utilization of flexible state LLC laws. (*See id.* at ¶ 33.)

### C. GlaxoSmithKline Holdings (Americas) Inc. ("GSK Holdings") Is a Holding Company, and Its Functions Are Narrow and Straightforward.

The sole member of GSK LLC is GSK Holdings. (Heslop Decl. at ¶ 11; *see also* Heslop Dep. at 17.) Formed in 1999, GSK Holdings has owned GSK LLC and its predecessors, first as a shareholder (for the corporation) and then as a member (for the limited liability company) for more than a decade, starting well before SmithKline Beecham Corporation ever contemplated becoming a Delaware limited liability company. (Heslop Decl. at ¶ 11; Heslop Dep. at 17.)

GSK Holdings is a holding company. As such, it has always had narrow functions and activities. A holding company is defined as "a corporation organized to hold the shares of another or other corporations." FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 2821 (2010); Macey Decl. at ¶ 28 (same). Although the LLC structure only dates back to the 1970s, the holding company structure has been used since the inception of the corporate form. (*See* Macey Decl. at ¶ 28.) Because of the benefits that holding companies provide, holding companies are, like LLCs, very common. (*See id.* at ¶¶ 28-29; *see also* Heslop Dep. at 148 (describing holding companies as "very, very common" in business). Holding companies can offer several advantages because their simplified structure allows companies to reorganize and restructure more easily than can a single, monolithic company. For example, whereas a sprawling company might have to put actual assets or capital resources on the auction block in order to divest itself of a division, a holding company can accomplish the same transaction much more easily simply by selling the stock of the subsidiary company that owns the assets or capital resources.

Holding companies are distinguished from operating companies, which manufacture goods and/or sell services. (*See* Macey Decl. at ¶¶ 30-31.) (They are also distinct from "mixed" holding companies or "holding-operating" companies, which perform both as holding companies and as operating companies.) So-called "pure" holding companies like GSK Holdings are not complex. Their functions are narrow and straightforward. *See id.; see also* FLETCHER, § 2821 (explaining that holding companies are created "merely for the purpose of holding the control of others by acquiring a majority of their shares"). Thus, although a holding company may own controlling shares in a complex operating company (*e.g.*, one that makes, sells, and markets prescription drugs), the holding company itself does not do or transact the business of that operating company. *See id.*

Deposition testimony from GSK Holdings' Former President Julian Heslop and its Vice President Michael Corrigan bear out that distinction for GSK Holdings.[2] As a holding company, GSK Holdings is "relatively simple" and its "affairs are very simple, very straightforward." (Heslop Dep. at 42; *see also id.* at 185 ("We are talking about a relatively simple entity, with relatively few transactions . . . .").) The business of GSK Holdings "is very much holding other companies and activities related to that." (*Id.* at 59.) GSK Holdings holds cash, money market investments, an investment in its subsidiary GSK LLC, and intercompany accounts that are used to make loans between GSK Holdings and other members of the GSK group of companies. (*Id.* at 59-60.) It declares dividends up the corporate chain to its parent companies. (*Id.* at 133.) The management of intercompany debts is also a significant part of GSK Holdings' activities. (Corrigan Dep. at 17.) For example, in recent years, the company has owed and subsequently repaid more than $10 billion of intra-group debt, which arose as part of the restructuring required

---

[2] Mr. Heslop has retired and GSK Holdings' current president is Simon Dingemans.

with the merger of Glaxo Wellcome and SmithKline Beecham in 2000. (Heslop Decl. at ¶ 15.)

GSK Holdings also pays taxes, and it has litigated over its rights and liabilities. (*Id.*)

Because GSK Holdings is not an operating company, it does not have "sales and cost of goods and salesmen and things like that." (Heslop Dep. at 59-60.) It does not research or develop medications, manufacture any goods, or provide or sell any services. (*Id.* at 150.) This stands in stark contrast to GSK LLC, which *is* an operating company organized and operated for the purpose of researching, developing, and marketing pharmaceutical products. (*Id.*; *see also* Heslop Decl. at ¶ 16.) While GSK Holdings owns GSK LLC as a subsidiary asset, that does not change the essential nature of GSK Holdings as a holding company. GSK Holdings is not transformed into an operating company simply by virtue of owning an operating company. Instead, it remains a holding company, together with the narrow function and activities of a holding company.

### D.   GSK Holdings Performs Its Limited Functions as a Holding Company in Quarterly and Special Meetings Held in Delaware.

All of the board meetings for GSK Holdings are held in Wilmington, Delaware. (Heslop Dep. at 156.) When individual board members cannot personally attend these board meetings in Wilmington, Delaware, they can attend via telephone. Unless he is unavailable, the meetings are chaired by the Delaware-based director, Mr. Donald McLamb, from Wilmington, Delaware. Mr. McLamb and Ms. Elizabeth Bothner, the Assistant Secretary of GSK Holdings, prepare the minutes for each board meeting. The meeting minutes are maintained in Wilmington, Delaware by Ms. Bothner.

At these regular, quarterly board meetings held in Wilmington, Delaware -- and at special meetings also held in Wilmington, Delaware -- the directors of GSK Holdings make the decisions that authorize and give effect to GSK Holdings' activities. (Heslop Dep. at 66, 157-58;

11

*see also* Corrigan Dep. at 23-25.)  For example, it is at board meetings that GSK Holdings'
directors:

- approved the distribution of shares required for the ViiV joint venture;

- approved the timing and magnitude of past dividend payments up the
  corporate chain to the corporation's shareholder;

- reviewed and approved the corporation's financial statements;

- elected and made changes required to officers regarding appointment of
  officers; and

- authorized individuals to act on the corporation's behalf on both one-time
  matters (*e.g.*, authorizing someone to take the steps necessary to
  accomplish a specific distribution) and routine matters (*e.g.*, appointing
  individuals to sign general types of documents on the corporation's
  behalf).

(*See* Heslop Decl. at ¶ 15; Heslop Dep. at 49, 87-89, 119-122, 165; Corrigan Dep. at 11-12, 25-
28.)

        These actions, while relatively straightforward, can only be accomplished when the three
directors for GSK Holdings act in concert as a board, casting votes and adopting resolutions --
and this only happens in Wilmington, Delaware.  Both Mr. Heslop and Mr. Corrigan have
testified, and the By-Laws confirm, that none of the three directors, acting alone, has the power
to cause GSK Holdings to take any new, previously unauthorized actions.  (GSK Holdings By-
Laws (as Amended and Restated October 29, 2010) Art. II, Sect. 3.7 (Ex. G); Heslop Dep. at
157-58; Corrigan Dep. at 25.)  Moreover, none of the three directors can or does control the vote
of any other director.  (Heslop Dep. at 163-64; Corrigan Dep. at 24.)  Nor do any of the directors

confer with one another and decide, in advance of any board meetings, how they will vote on

particular agenda items. (Heslop Dep. at 164; Corrigan Dep. at 24.) Instead, each of the three

directors is guided in his votes by his own knowledge of the facts and strategies of GSK's

various business interests and by his duty as an officer and director to act in the best interest of

GSK Holdings and its shareholders, i.e., its parent companies. (Heslop Dep. at 162-63; Corrigan

Dep. at 23-25.) They coordinate and cast their votes only during the regular, quarterly board

meetings held in Wilmington, Delaware -- or at special meetings also held in Wilmington,

Delaware. Consequently, it is only at these board meetings that the board members direct GSK

Holdings to perform its relatively narrow functions as a holding company.

Because the operations of GSK Holdings are so straightforward, these quarterly board

meetings and special meetings are not only sufficient to control and direct company business but

in fact "work[] very well" to accomplish those tasks. (Heslop Dep. at 166-67.) Mr. Heslop

testified that four meetings per year are quite sufficient for a holding company like GSK

Holdings:

Q.     Do you believe that meeting at quarterly meetings or at special
       meetings is sufficient for GSK holdings to conduct its business?

A.     Yes, I do.

Q.     Why is that?

A.     Because, I think I would differentiate between a holding company,
       which as I said before is responsible, has subsidiaries or a
       subsidiary, in the case of Holdings Americas below it, has intra
       group accounts, has dividends and other issues to discuss relating
       to organization, but it is not an operating company which has daily
       sales, daily costs of goods.

       *If you can imagine the difference, if you have an operating
       company, you have a huge amount of daily matters.* By the time
       you get to the end of the month and you have an executive
       meeting, you have a lot of matters to transact. As for Boards of a
       company with obviously a lot of trading, you know, you probably

13

> need to meet eight times a year. *When you come to a holding*
> *company, whose affairs are infinitely simpler,* who has no
> employees, a much simpler company, who has dividends to
> approve, maybe major restructuring, but it is much, much simpler,
> so by its very nature you would not expect to spend much time,
> and *quarterly works very well actually.*

(*Id.* (emphasis added).)

To perform these relatively simple functions, GSK Holdings does receive some *support*

*services* from personnel within the GSK group of companies in other locations. For example, the

financial statements reviewed, discussed, and approved at Board meetings are prepared by

personnel in London under the direction of Mr. George Brown, who is also based in London.

(Heslop Dep. at 61-62; Corrigan Dep. at 38-39.) The U.S. financial group in Philadelphia is not

involved in the preparation of GSK Holdings' financial statements, nor do they have control over

or access to them. (Corrigan Dep. at 38.) The company receives support on routine U.S. tax

issues from GSK personnel in Philadelphia who report to personnel in London. Often,

particularly for significant or complex tax issues, the company relies on personnel in London and

engages external consultants such as PricewaterhouseCoopers. (Heslop Dep. at 26-27, 74-75,

184-86.) While GSK Holdings chooses to obtain support services internally from the GSK

group of companies, they could also be provided by a third party. (*Id.* at 167-68, 184-86.) And

although GSK Holdings receives some support services from personnel in Philadelphia and

London, these personnel cannot take any action that has not been authorized by GSK Holdings'

Board of Directors in Wilmington. (*See id.* at 183 (agents "are constrained by what the Board of

Directors authorizes or, if it is day-to-day activities, which is obvious, they are dependent on a

general authority to enter into transactions on behalf of the company . . . .").)

While GSK Holdings receives *services* from GSK personnel in various cities, the

*strategic input,* outside of Delaware, for GSK Holdings comes from London. Mr. Heslop clearly

14

distinguished between services and strategy in describing the nature of the support that GSK

Holdings receives from GSK personnel in London, versus that received from GSK personnel in

Philadelphia:

Q.   As between London and Philadelphia, where would you say most
of the significant work supporting GSK Holdings comes from?

MR. BLIZZARD:  Object to the form.

A.   *I would say strategy definitely from London.* I would say in terms
of services between the two. *Do you see the differentiation
between strategy and services?*

Q.   Can you explain?

A.   Yes. *Services is something you can provide internally to another
group company or externally.* You really can provide them
internally or externally. Some big groups have a lot of these
services provided externally but we have chosen to provide a lot of
these treasury and accounting services and tax services internally,
provision of services to companies. *It is not strategic deliberation,
it is not the major strategic stuff,* and in term of services we get
them from Philadelphia and we get them from the UK pretty
equally, but in terms of strategy and strategic formulation,
particularly led by myself, that is London.

(*Id.* at 185-86 (emphasis added).)

Again and again, Mr. Heslop testified that London is the "strategic home" of the GSK

group of companies (including GSK Holdings):

Q.   Can you describe for us what sort of services GSK Holdings
receives from personnel in London?

A.   London is very much the strategic home of GlaxoSmithKline plc.
So it is where we determine our strategy, our direction, our
financing strategy, the optimal tax structuring for the group, so
very much those sorts of matters. So anything that impinges upon
GlaxoSmithKline Holdings Americas that relates to strategic
formulation would come out of my office and the people who work
for me in London.

* * *

15

Q.      [I]s there a difference in the weighting that GSK Holdings gives
        the services that are received from London, versus the services that
        are received from Philadelphia?

A.      I think strategic direction and guidance, you know, for plc
        emanates from London, so to the extent something needs to come
        to GlaxoSmithKline Holdings Americas for its approval, which is
        strategic in nature, that sort of level would almost certainly come
        out of London.

(*Id.* at 167, 169.)

        Further proof that the strategy for GSK Holdings, outside Delaware, originates in London

can be seen in the reporting chain of command for the U.S.-based GSK personnel who assist

GSK Holdings. As can be seen from the chart below, some of the main U.S.-based personnel

identified in Mr. Heslop's and Mr. Corrigan's deposition as providing services to GSK Holdings

actually report to superiors in London, either directly or through intermediaries:

| U.S.-based employee | Department area | Reports to |
|---|---|---|
| Jan Lyons (Phila.) | Tax | Helen Jones (London) |
| Audrey Klijian (Phila.) | Treasury | Sarah-Jane Chilver-Stainer (London) |

(Heslop Dep. at 7, 26-27, 44, 116, 168-69, 178; Corrigan Dep. at 57-58.)

        Summing up the differences between these three locations -- Delaware, London, and

Philadelphia -- Mr. Heslop testified that Delaware is still the place where GSK Holdings makes

its decisions. While certain strategic input may come from London, and supporting services

from both Philadelphia and London, it is only in Delaware that these potential strategies and

financial information are actually translated into action for GSK Holdings. Without a meeting

and a vote by the board of directors, GSK Holdings cannot act:

Q.      Can you just sort of generally describe for us how in your mind
        these three cities relate to one another in terms of the work that is

16

done there, the importance of the work in Delaware, London and Philadelphia?

> MR. BLIZZARD:  Object to form.

A.  Yes.  I mean, *Delaware is the domicile* of GlaxoSmithKline Holdings Americas, it is where it was incorporated.  It is where the Board meetings are held, as I have previously testified.  *It is where the decisions are made for GlaxoSmithKline Holdings Americas.* Services are provided out of London and out of Philadelphia, which actually in many respects, if you wanted to, could be provided by third party, if you wanted it to be provided by a third party.  We generally provide a lot of these services internally within the group.  It makes sense.

Then strategy comes out of my office, ably supported by my direct reports, using their teams of people.    That is how I would differentiate it.

I would go back to the fact that we are talking about a holding company here.  We are not talking about a complex entity.  We are talking about a relatively simple entity, with relatively few transactions in the scheme of things typical, of many a holding company, and GSK providing those services from London and Philadelphia with the sort of significant strategic input coming out of my office and my direct reports' offices in London.

(Heslop Dep. at 184-85 (emphasis added).)

## III.    ARGUMENT AND CITATIONS TO AUTHORITY

A.    **Plaintiffs' Motion To Remand Should Be Denied Because GSK LLC Is A Citizen Of Delaware, Not Pennsylvania.**

   1.    **The Court Should Reconsider the New Citizenship Rule Set Forth in *Brewer* in Light of the Fact that GSK LLC Was Formed as a "Manager-Managed" LLC.**

Before *Brewer*, the citizenship rules for corporations and LLCs were relatively settled.  A

corporation was a citizen of its state of incorporation and the state where it has its principal place

of business, i.e., "where [the] corporation's officers direct, control, and coordinate the

corporation's activities," otherwise known as its "nerve center."  *Hertz Corp. v. Friend*, 130 S.

17

Ct. 1180, 1192 (2010)). An LLC's citizenship was determined by the citizenship of its members. *Zambelli Fireworks Mfg. Co., Inc. v. Wood*, 592 F.3d 412 (3d Cir. 2010). Where an LLC's members consisted of other LLCs or corporations, "the citizenship of unincorporated associations [such as LLCs] must be traced through however many layers of partners or members there may be" in order to determine citizenship. *Id.* at 420 (quoting *Hart v. Terminex Int'l*, 336 F.3d 541, 543 (7th Cir. 2003)). At each level, a court applies the citizenship rules that pertain to the member in question. Indeed, the Third Circuit performed exactly this multi-step analysis to the individuals and LLCs that were the members of the LLC party in *Zambelli*.

Applied to the facts of this case, because GSK LLC is a limited liability company, its citizenship is governed by that of its sole member, GSK Holdings. As a corporation, GSK Holdings is a citizen of its state of incorporation, Delaware, and the state in which it has its principal place of business as determined by the *Hertz* "nerve center" test. *Id.*; *see also* 28 U.S.C. § 1332(c).

Importantly, however, before *Brewer* the "nerve center" test was to be applied to GSK Holdings, not to GSK LLC. In *Brewer*, the Court said instead that it would "look to the *'nerve center'* of the *limited liability company* to which the holding company has delegated the operational decision-making" in determining the holding company's principal place of business. *Id.* at *5, *24 (emphasis added). Yet nothing in *Hertz* or *Zambelli* authorizes a special "meld[ed]" rule for single-member LLCs owned by holding companies. Indeed, *Zambelli* itself noted that the Supreme Court had "flatly rejected arguments in favor of extending the [principal place of business] rule of corporate citizenship to analogously formed business entities" like LLCs over 20 years ago. *Zambelli*, 592 F.3d at 419 (quoting *Carden v. Arkoma Assocs.*, 494 U.S. 185, 189 (1990) (internal quotation marks omitted)). Additionally, at least one post-*Hertz*

18

court has held that *Hertz* did not change the rules for LLCs. *See Bartram, LLC v. C.B. Contrs., LLC*, No. 1:09-cv-254-SPM/AK, 2010 U.S. Dist. LEXIS 92008, at *6-7 (N.D. Fla. Aug. 10, 2010) (post-*Hertz* decision explaining that "unlike corporations, the nerve center does not determine the citizenship of an LLC").

In *Brewer*, this Court justified its departure from existing law by reasoning that it was "confronted with an atypical factual scenario that requires us to apply the Supreme Court's 'nerve center' test enunciated in *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 175 L. Ed. 2d 1029 (2010), to determine the citizenship of a holding company that is the sole member of the defendant limited liability company" and explained that its determination that GSK is a citizen of Pennsylvania was based on "the unusual circumstances surrounding the relationship between the limited liability company and the holding company that owns an investment in it." *Brewer*, 2010 U.S. Dist. LEXIS 31149, at *5-6. Central to this Court's reasoning was that GSK Holdings had "delegated its rights and power to manage and control the business and affairs of LLC to LLC's directors and officers" *See id.* at *13 n.18.

Because the plaintiffs in *Brewer* had never advocated such a distinction, and therefore had conducted no discovery on it, the record in *Brewer* was not well-developed as to whether GSK LLC had been formed as a "manager-managed" or "member-managed" LLC. The record in *Brewer* was also not well-developed as to whether GSK Holdings had "delegated" its managerial responsibility for GSK LLC to the managers of GSK LLC in the manner described by the Court in *Brewer*. Finally, the record in *Brewer* was simply silent as to whether single-member LLC subsidiaries were so "unusual" or "atypical" as to warrant a departure from the ordinary application of *Hertz* and *Zambelli*.

19

With the benefit of the supplemented record in these cases, however, the Court can see very plainly that the "meld[ed]" rule set forth in *Brewer* has no application to GSK LLC. First, as set forth in Professor Macey's declaration, GSK LLC's structure as a single-member LLC subsidiary is neither "unique," "anomal[ous]," or "unusual." Instead, LLCs themselves are commonplace, existing by statute in every state in the country. (*See* Macey Decl. at ¶ 20.) Holding companies are similarly common, and for a holding company to wholly own an LLC -- in other words, to form a single-member LLC subsidiary -- is no more or less unusual than any other type of parent-subsidiary relationship. (*Id.* at ¶ 32.)

Second, and more importantly, GSK Holdings never "delegated the operational decision-making" of GSK LLC to anyone. GSK LLC was *formed* as a manager-managed LLC by its operating agreement pursuant to Delaware law. (*See* Macey Decl. at ¶ 37 (noting that GSK LLC's operating agreement states: "The business and affairs of the Company shall be managed by a Board of Managers (the "Board"), which shall consist of at least three persons (each such person, a "Manager").) As such, the right to manage GSK LLC was *vested* in its managers. (*See id.* at ¶¶ 37-38.)

Under § 18-407, the delegation of rights is distinct from the vesting of rights. (*See* Macey Decl. at ¶ 38.) Accordingly, "[a] member or manager first must have management authority under § 18-402 (as provided in the LLC's operating agreement) before it can delegate that authority under § 18-407." (*Id.*) GSK LLC's operating agreement did not give GSK Holdings the ability to manage the business and affairs of GSK LLC. (*See id.* at ¶ 39.) Because -- applying § 18-402 -- GSK Holdings did not have the right to manage the business and affairs of GSK LLC, it could not have *delegated* that right under § 18-407. (*See id.*) As a member of a "manager-managed" LLC, GSK Holdings has the obligation to appoint managers for GSK LLC

20

-- not to direct the LLC's business. In short, given that the "rights and power to manage and control the business and affairs of LLC" were never vested in GSK Holdings, it was impossible for GSK Holdings to have delegated those "rights and power" to anyone.

Not only was the Court's "meld[ed]" rule in *Brewer* based upon a faulty premise, but by considering the business activities of GSK LLC together with those of GSK Holdings, the Court improperly disregarded the distinction between the two entities. In the Third Circuit, it is well-established that citizenship determinations be based solely on the attributes of the *entity in question*, so long as corporate formalities are maintained. *See Quaker State Dyeing & Finishing Co., Inc. v. ITT Terryphone Corp.*, 461 F.2d, 1140, 1142 (3d Cir. 1972) (recognizing that a subsidiary incorporated as a separate entity has a separate principal place of business from its parent corporation);[3] *Topp v. CompAir Inc.*, 814 F.2d 830, 835 (1st Cir. 1987) ("[S]o long as the entity's corporate form is entitled to credibility, the nerve center test looks for the localized nerve center from which the corporation in issue is directly run.").[4]

Merely exercising the control that is incident to ownership does not allow a court to ignore corporate forms. *See Topp*, 814 F.2d at 835. For example, in *Stewart v. Precision Airmotive Corp.*, this Court concluded that it is inappropriate to consider the activities of subsidiaries when determining the principal place of business of a parent. No. 07-1610, 2007

---

[3] *See also, e.g., EverNu Tech., LLC v. Rohm & Haas Co.*, No. 10-2635, 2010 U.S. Dist. LEXIS 88921, at *5-6 (E.D. Pa. Aug. 26, 2010) (applying *Quaker State* and *Topp* in determining a subsidiary corporation's nerve center); and *Holly Farms Corp. v. Taylor*, 722 F. Supp. 1152, 1158 (D. Del. 1989) (applying *Quaker State* and *Topp*).

[4] *See also De Walker v. Pueblo Int'l, Inc.*, 569 F.2d 1169, 1173 (1st Cir. 1978) ("If the court may not look to the activities of a separately incorporated subsidiary for purposes of determining whether its parent is 'doing business' in a state, there is no reason to look to the subsidiary to determine whether the parent has its 'principal place of business' in that state."); *Schwartz v. Elec. Data Sys., Inc.*, 913 F.2d 279, 283 (6th Cir. 1990) (noting that every court of appeals that has considered the question has agreed that, when corporate formalities are maintained, jurisdiction over a subsidiary is determined based on the subsidiary's citizenship); *J.A. Olsen v. City of Winona, Miss.*, 818 F.2d 401 (5th Cir. 1987) (refusing to impute citizenship of a parent to the subsidiary when the two corporations were separately incorporated).

U.S. Dist. LEXIS 74194, at *7 (E.D. Pa. Oct. 3, 2007). The *Stewart* decision came in the context of a parent corporation that was the sole member of an LLC. As in *Stewart*, a corporation's principal place of business is properly determined by focusing on the entity in question. In *Brewer*, this Court looked through GSK Holdings to the operations of GSK LLC, even though the record is devoid of any evidence that would support piercing the corporate veil. This approach invites courts to become "mired down in the hopeless and unnecessary task of deciphering the internal power struggles" within related entities, *Topp*, 814 F.2d at 837, contrary to *Hertz*'s emphasis on simplicity.

In light of the supplemented record in these cases, therefore, GSK respectfully submits that the Court should reconsider the new citizenship rule that it proposed in *Brewer*. The relationship between GSK Holdings and GSK LLC is not anomalous, but commonplace. GSK LLC was a "manager-managed" LLC from its inception, and thus it was impossible for GSK Holdings to have "delegated" any "rights and power to manage and control the business and affairs of LLC" -- because those "rights and power" were never vested in GSK Holdings. Instead, the control that GSK Holdings had over GSK LLC was much more akin to the control that is incident to ownership; under settled Third Circuit law, that control is insufficient to justify disregarding the separate and distinct corporate and LLC entities of GSK Holdings and GSK LLC. In sum, the supplemented record in these cases demands a more straight-forward application of *Hertz* and *Zambelli*, which as discussed in the section below, leads to the conclusion that GSK Holdings is a citizen of Delaware alone.

### 2. GSK Holdings Is a Citizen of Delaware Alone Because Its "Nerve Center" Is in Delaware.

As two other courts have held, GSK Holdings' activities are directed, controlled, and coordinated at meetings of its board of directors in Wilmington, Delaware, making it (and

22

therefore GSK LLC) a Delaware citizen. *White*, 2010 U.S. Dist. LEXIS 79520; *Hoch*, 736 F.

Supp. 2d 219. Even as it existed in *Brewer*, the record demonstrates that GSK Holdings' limited

activities as a holding company are directed, controlled, and coordinated at meetings of its board

of directors in Wilmington, Delaware. (*See* Heslop Dep. at 184:21-185:1; Corrigan Dep. at 24:7-

13; McLamb Dep. at 128:19-129:8 (Ex. H).) *See also White,* 2010 U.S. Dist. LEXIS 79520, at

*8-9; *Hoch,* 736 F. Supp. 2d at 221. To the extent that GSK Holdings receives strategic input

from outside of Delaware, it comes from London – the "strategic home" of the GSK group of

companies (including GSK Holdings). (*See* Heslop Dep. at 167:12-22; 169:8-170:3.)

GSK Holdings' Board of Directors holds quarterly meetings in Delaware. (Heslop Decl.

at ¶ 22; Heslop Dep. at 184-85.) At the quarterly meetings, the Board of Directors reviews and

approves the corporate accounts, and reviews, controls, and ratifies the key business activities

of GSK Holdings. (Heslop Decl. at ¶ 22.) Minutes reflecting the actions of the GSK Holdings

Board are stored with the corporate secretary at corporate headquarters in Wilmington, Delaware.

(*Id*; Heslop Dep. at 156.) The administrative functions attendant to the meetings of the directors,

including the keeping of minutes and other efforts of GSK Holdings' Secretary and Assistant

Secretary, are centralized in Wilmington, Delaware. *Id.* GSK Holdings' activities are controlled

and coordinated through the actions and decisions of its officers and directors. (Heslop Decl. at ¶

19.) Being a holding company, those activities are relatively few and are controlled and managed

primarily through review and ratification of financial accounts. *Id.* But GSK Holdings'

Delaware headquarters is the center of its direction, coordination, and control – its nerve center.

*See White*, 2010 U.S. Dist. LEXIS 79520, at *8 (Mr. Heslop's statements "provide ample evidence

that GSK Holdings' 'nerve center' is in Delaware.").

23

GSK Holdings is directed and controlled from Delaware, and to the extent that direction

and control is informed by strategic guidance from elsewhere, that guidance comes from the

headquarters of GlaxoSmithKline plc in London, not from Philadelphia. (*See* Heslop Dep. at

167-69; *see also infra*, pp. 34-36.) Plaintiffs' Motion does not address the strategic direction and

coordination that GSK Holdings' Board performs in Wilmington, and although Plaintiffs argue

GSK Holdings' nerve center is in Philadelphia, Plaintiffs' Motion does not identify a single

activity of GSK Holdings in Philadelphia that constitutes direction, control, or coordination.

(*See* Pls.' Mot. at 3-4 (execution of document in Philadelphia pursuant to authority given *in

Wilmington*), 8 (preparation of a tax return in Philadelphia pursuant to authority given *in

Wilmington*); *see also* Corrigan Dep. at 14-28 (GSK Holdings' Vice President explaining the

source of his authority to execute the document); Heslop Dep. at 183, 186, 188 (GSK Holdings'

then-President explaining tax services are provided by authorized agents).) And although *Hertz*

rejected the idea that a statement in a public document can establish a corporation's nerve center,

*see* 130 S. Ct. at 1194-95, Plaintiffs' reliance on GSK's annual report only undermines their

position: the annual report identifies *GSK Holdings'* headquarters as *Wilmington*. (*See* Pls.'

Mot. at 5.)

In reaching a contrary conclusion in *Brewer*, this Court misapplied the "nerve center" test

adopted in *Hertz*. Under this "nerve center" test, a court is to determine the location from which

a corporation's officers and directors "direct, control, and coordinate" its activities. *Hertz*, 130

S. Ct. at 1192. This Court did not dispute that GSK Holdings does the things that holding

companies normally do, and that its activities in that regard comply with Delaware law. *Brewer*,

2011 U.S. Dist. LEXIS 31149, at *13 (recognizing that GSK Holdings is a holding company, not

an operating company). Nor did the Court dispute that those activities take place in Delaware.

Instead, this Court found that GSK Holdings' nerve center is in Philadelphia by focusing on business activities that are irrelevant under *Hertz*.

In attempting to locate the "nerve center" of GSK Holdings, however, the Court in *Brewer* did not give sufficient weight to the location at which corporate decision-making actually takes place. The focus of *Hertz* is on the place where the people who direct and control the corporation exercise that direction and control — not on the location of physical assets or records. In *Brewer*, this Court gave undue weight to, for example, the size of the office that GSK Holdings leases in Delaware, the manner in which that office is furnished, the number of individuals employed by GSK Holdings, the manner in which incoming calls and mail are routed,[5] and the amount of time it takes GSK Holdings' directors to conduct a meeting. *Brewer*, 2011 U.S. Dist. LEXIS 31149, at *18-21. But none of these factors informs the true nerve center analysis. The *Hertz* court explicitly rejected tests focused on "weigh[ing] corporate functions" in favor of the simpler "nerve center" test. *See Hertz*, 130 S. Ct. at 1194 ("Our approach provides a sensible test that is relatively easier to apply . . . ."); *see also Cent. W. Va. Energy Co, Inc. v. Mountain State Carbon, LLC*, No. 10-1486, 2011 U.S. App. LEXIS 7557, at *15 (4th Cir. Apr. 13, 2011) (citing *Hertz*, 130 S. Ct. at 1193) (refusing to examine factors such as how much time corporation's officers devote to directing its business versus that of its affiliated companies because "doing so would subvert the Supreme Court's guiding principle in *Hertz* — establishing a simple jurisdictional rule to avoid resource-intensive litigation").[6]

---

[5] The Court was also mistaken as to how telephone calls and mail were handled by GSK Holdings in Wilmington. (*See* McLamb Dep. at 16:23-17:22 (discussing handling of telephone services); *id.* at 43:24-44:10 (discussing handling of mail forwarding).

[6] In *Central West Virginia Energy*, the Fourth Circuit included a footnote stating that the "proliferation of complex corporate structures . . . may compel further attention to the issue of 'principal place of business' under 28 U.S.C. §1332." 2011 U.S. App. LEXIS 7557, at *16-17 n. 3. The court included a "cf." cite to *Brewer*. The Fourth Circuit's citation in dicta to *Brewer* is not an acceptance of *Brewer*'s reasoning. Moreover, GSK submits that the Fourth Circuit's logic in *Central West Virginia Energy* would compel a ruling for GSK in *Brewer* as well as this case. *See id.* at *4-5 (looking to LLC's members' citizenship to determine LLC's citizenship without regard to

25

### 3.   As Shown by the Supplemented Record, Any Suggestion That GSK Holdings Is an "Artifice to Manipulate Jurisdiction" is Misplaced.

In finding that GSK Holdings' nerve center is Philadelphia, this Court also noted that (1)

GSK Holdings by-laws stated that Philadelphia was the location of GSK Holdings' office, books

and records, and Board of Directors' meetings, and (2) certain contracts with the U.S.

Government identified GSK Holdings as the contracting party and listed a Philadelphia address.

*Brewer*, 2011 U.S. Dist. LEXIS 31149, at *29-30.  However, these documents were inaccurate

and did not reflect the *actual business practices* of GSK Holdings or GSK LLC.

When these errors were discovered in discovery, GSK LLC and GSK Holdings took steps

to correct the contracts and by-laws.  As set forth in the declaration of GSK Holdings' Director

Donald McLamb, GSK Holdings' meeting minutes and corporate seal have been maintained in

Wilmington, GSK Holdings' directors have met in Wilmington, and GSK Holdings' only office

has been maintained in Wilmington since June 2004 when he was appointed as Director and

Secretary of GSK Holdings.  (May 26, 2011 Declaration of Donald McLamb at ¶ 5 (Ex. I).)

When the errors in the by-laws came to the attention of GSK Holdings' then-President, Julian

Heslop, in October 2010, the by-laws were amended.  (*Id.* at ¶ 6.)

As set forth in the declaration of Victor G. Vogel, who is employed by GSK LLC as

Government Contracts Counsel for GSK Biologicals North America, certain contracts in the

*Brewer* record listed GSK Holdings as a contracting party because the Data Universal

Numbering System ("DUNS") number assigned by Dun and Bradstreet to GSK Holdings was

incorrectly used in place of the DUNS number assigned to the true contracting party, SmithKline

---

activities conducted by LLC) ; *id.* at *9-10 (focusing on place where LLC's member's corporate officers conducted
oversight and strategic decision-making); *id.* at *10-11 (recognizing that addresses on a government form were
irrelevant under *Hertz* test); *id.* at *11-12 (giving no weight to evidence of daily management activities in
conducting *Hertz* nerve center analysis); *id.* at *15 (giving no weight and refusing invitation to examine how much
time LLC's member's officers devote to member company business versus affiliated company business).

Beecham Corporation d/b/a GlaxoSmithKline (which was converted to GSK LLC in October 2009). (Declaration of Victor G. Vogel at ¶ 5 (Ex. J).) GSK Holdings did not enter into or perform those contracts. (*See id.*) As with the errors in the by-laws, when the errors in the contracts were discovered, those responsible for the contracts took steps to correct those errors to clarify that the actual contracting party was GSK LLC. (*See id.* at ¶ 7.) GSK LLC requested approval from the U.S. government to correct certain contracts to reflect that GSK LLC -- not GSK Holdings -- was the party to and entity that performed the contracts. GSK LLC is continuing to work with the U.S. government to correct any outstanding contracts that erroneously identified GSK Holdings as the contracting party.

Although the *Brewer* opinion suggests that "[GSK] Holdings fits the profile of a company described by the Supreme Court in *Hertz* as an artifice to manipulate jurisdiction," *Brewer*, 2011 U.S. Dist. LEXIS 31149, at *29, the record shows -- and this Court agreed -- that SmithKline Beecham converted into an LLC, not to manipulate diversity jurisdiction, but to facilitate the creation of a joint venture dedicated to the discovery, development, and commercialization of innovative HIV/AIDS medications. *See supra* pp. 10-12; *Brewer*, 2011 U.S. Dist. LEXIS 31149, at *29 ("[GSK] LLC was formed to accomplish a legitimate business purpose and not to manipulate jurisdiction for litigation purposes.").

GSK Holdings was incorporated in 1999 -- nearly 10 years before GSK LLC was formed. Thus, GSK Holdings was a legitimate holding company both before and after SmithKline Beecham Corporation converted into GSK LLC. (*See* Macey Decl. at ¶ 34 (explaining that GSK Holdings is typical of pure holding company).) From GSK Holdings' perspective, the conversion of SmithKline Beecham Corporation to GSK LLC did not change anything except that GSK Holdings owned the equity of an LLC rather than the equity of a corporation. (*See id.*

27

¶ 43c.) The fact that the nature of GSK Holdings' ownership changed -- before either *Hertz* or *Zambelli* were decided -- or that a holding company's activities are limited, such that its business can be adequately conducted in brief meetings, does not mean that an "artifice" has been created.

### 4.      Plaintiffs Rely on Irrelevant Facts and Inapposite Authority.

For all the reasons shown above, Plaintiffs' reliance on GSK LLC's activities misses the point. Plaintiffs also cite unrelated court documents suggesting that GSK LLC is a Pennsylvania citizen. (*See* Pls.' Mot. at 6-7.) These documents do not change the result. The Third Circuit has recognized that statements of an entity's principal place of business in prior pleadings "have no intrinsic capacity either to establish or disestablish jurisdiction." *Mennen Co. v. Atl. Mut. Ins. Co.*, 147 F.3d 287, 293 (3d Cir. 1998).[7] All of these pleadings refer to the principal place of business of GSK LLC or its predecessor, SmithKline Beecham Corporation, not that of GSK Holdings. Two of the pleadings Plaintiffs cite were related to patent infringement cases, where the court's jurisdiction was based on a federal question, and so the phrase "principal place of business" was not even being used to establish diversity of citizenship, pursuant to 28 U.S.C. § 1332(c). *See* 28 U.S.C. §§ 1331, 1338. The cited pleadings do not change any of the relevant facts showing that GSK Holdings, and therefore GSK LLC, is a Delaware citizen.

Plaintiffs' contention that GSK Holdings' nerve center is not in Delaware because "none of GSK Holdings' directors or officers actually work in Delaware," (Pls.' Mot. at 28), is also wrong on both the facts and the law. Mr. McLamb, the director who chairs GSK Holdings' meetings, is resident in and works primarily in Delaware. (2010 McLamb Decl. ¶ 2 (Ex. K).) Regardless, the *Hertz* court cautioned against heavy reliance on metrics such as the physical

_____

[7] Because *Mennen* was decided before *Hertz*, the court's determination of the party's principal place of business was based on the former "center of corporate activities" test, which is no longer applicable. However, the Third Circuit's evaluation of the effect of prior statements of a corporation's principal place of business was not overruled.

28

presence of employees because of the way modern corporations operate. *See Hertz*, 130 S. Ct. at 1194 (noting application of the nerve center test must accommodate that "in this era of telecommuting, some corporations may divide their command and coordinating functions among officers who work at several different locations, perhaps communicating over the Internet"). Plaintiffs' repeated references to Wilmington as a "mail drop" are similarly without merit and contradicted by the record. (Heslop Dep. at 66, 157-58; Corrigan Dep. at 23-25; 2010 McLamb Decl. at ¶¶ 5, 7-8.)

Plaintiffs' reliance on *Kelly v. United States Steel Corp.*, 284 F.2d 850 (3d Cir. 1960), and cases applying *Kelly*, is equally misplaced. The *Kelly* court's "center of corporate activity" test does not, as Plaintiffs argue, "dovetail[], in relevant aspects, the Supreme Court's *Hertz* 'nerve center test.'" (Pls.' Mot. at 27.) In *Kelly*, the court *expressly rejected* the nerve center test. *See Kelly*, 284 F.2d at 853 (rejecting argument that "the test should be where the 'nerve center' of the corporation's business is"); *see also 212 Marin Blvd., LLC v. Chi. Title Ins. Co.*, No. 09-6366, 2010 U.S. Dist. LEXIS 82589, at *6 (D.N.J. July 8, 2010) (noting *Kelly* established a test that the Supreme Court rejected in *Hertz*); *Comerica Bank v. Merriweather Rd. Ltd.*, No. 09-13497, 2010 U.S. Dist. LEXIS 49285, at *3-4 (E.D. Mich. May 19, 2010) (same).

Plaintiffs' attempt to gloss over this fact in a footnote is unavailing. (*See* Pls.' Mot. at 26 n.69). The *Kelly* court found that "the final decisions through the Board of Directors, the President and top executive officers are made in New York state" but held the defendant was a citizen of Pennsylvania because its "business by way of activities is centered Pennsylvania." 284 F.2d at 853-54. Thus, *Kelly* rejected the *substance* of the nerve center test subsequently adopted in *Hertz*, not simply the "*moniker*" as Plaintiffs suggest. *Compare Kelly*, 284 F.2d at 854 (rejecting argument that a corporation's principal place of business is where "final decisions are

29

made on corporate policy") *with Gray v. Hawkeye Construction Co. LLC*, No. 10-1056, 2010

U.S. Dist. LEXIS 110194, at *7-8 (S.D. W. Va. Oct. 15, 2010) (applying *Hertz* and holding a

corporation's nerve center was in Missouri because "nearly every corporate decision or corporate

policy either starts in Missouri or passes through Missouri before it becomes finalized").

### B. Although Delaware Remains GSK Holdings' "Nerve Center," Strategic Input Emanating From Outside of Delaware Comes From London – Not Philadelphia.

As set forth above, GSK Holdings has a simple structure and a limited function. The

only direction GSK Holdings requires relates to financial and strategic decisions on its notes,

loans, and investments. That direction is delivered primarily in the form of review and approval

of financial accounts at the quarterly Directors meetings in Delaware. But GSK Holdings does

not exist in a vacuum. It is responsive to strategic input it receives from its affiliated companies

in London and Philadelphia.

As between London and Philadelphia, it is clear that GSK Holdings receives greater

strategic input from London. (*See* Heslop Dep. at 167 ("[A]nything that impinges upon [GSK

Holdings] that relates to strategic formulation would come out of my office and the people who

work for me in London."). For example, London is where investment decisions are made, where

personnel directed significant U.S. tax litigation, where the ViiV joint venture that was the basis

of GSK LLC's formation was "orchestrated," and where the "vast majority" of legal work is

done. (Heslop Dep. at 62-63, 170; Corrigan Dep. at 95.) Not surprisingly, GSK personnel who

are knowledgeable about the relationship between GSK Holdings and other GSK entities

(including GSK LLC) either are part of, or report to, the group in London that provides strategic

input. (*See* Heslop Dep. at 6, 116, 168; Corrigan Dep. at 93-95.)

But even assuming for the sake of argument that this strategic influence were so significant as to shift the "nerve center" for GSK Holdings from Wilmington to London, it does not change the outcome here. On the contrary, it is well settled that "[a] corporation incorporated in the United States with a principal place of business abroad is a citizen solely of the state of incorporation." 15 Moore's Fed. Prac. § 102.50 (3d ed. 2010); *see also, e.g., MAS Capital, Inc. v. Biodelivery Sciences Int'l*, 524 F.3d 831, 832-33 (7th Cir. 2008) (corporation that was incorporated in Nevada and had its principal place of business in Taiwan was a citizen of Nevada alone); *Torres v. Southern Peru Copper Corp.*, 113 F.3d 540, 543-44 (5th Cir. 1997) ("[W]e must conclude that for diversity purposes a corporation incorporated in the United States with its principal place of business abroad is solely a citizen of the 'State' of incorporation.").

That is true, even where the entity in question has contacts with states other than its state of incorporation. For example, in *In re Hydroxycut Mktg. and Sales Practices Litig.*, No. 09MD2087-BTM, 2010 U.S. Dist. LEXIS 76751 (S.D. Cal. July 29, 2010), the defendant was incorporated in Delaware and the issue was whether its principal place of business was in Delaware, New York, or Ontario, Canada. *Id.* at *6. Applying *Hertz*'s nerve center test, the court held that although the bulk of the company's visible business activities took place in New York, the defendant's principal place of business was Ontario because that is where high level decisions were made and instructions were given. *Id.* at *10-11. Since the defendant was therefore only a citizen of Delaware, the court denied the motion to remand. *Id.* at *15; *see also, e.g., Great Lakes Transmission L.P. v. Essar Steel Holdings Minnesota, LLC*, No. 09-3037, 2010 U.S. Dist. LEXIS 2969, at *5 (D. Minn. Jan. 14, 2010) (Delaware company whose principal place of business is in Canada is only a citizen of Delaware for diversity analysis); *Glenn Seed, Ltd. v. Vannet*, No. 09-309, 2009 U.S. Dist. LEXIS 93739, at *3 (W.D. Wis. Oct. 7, 2009) (South

31

Dakota company whose principal place of business is in Canada is only a citizen of South

Dakota for diversity analysis); *Bowen Med. Co. v. Nicolet Biomedical, Inc.*, No. 02-1070, 2002

U.S. Dist. LEXIS 27155, at \*3 (W.D. Wis. Nov. 14, 2002) (California company whose principal

place of business is Hong Kong is only a citizen of California for diversity analysis).

 In short, even if this Court were to find that GSK Holdings' principal place of business is

London rather than Wilmington, Delaware, complete diversity still exists, and the rule barring

removal by a resident defendant still would not apply, because GSK Holdings would only be a

citizen of its state of incorporation, Delaware.

### C. SmithKline Beecham Corporation Was Converted into GSK LLC and Cannot Be Sued as a Dissolved Corporation.

 Finally, Plaintiffs argue SmithKline Beecham Corporation can be sued as a dissolved

corporation. As this Court and others have already found, this argument fails because it is based

on an incorrect interpretation of Pennsylvania law and a misunderstanding of the events related

to SmithKline Beecham Corporation's conversion into a Delaware limited liability company.

#### 1. SmithKline Beecham Corporation Did Not Dissolve Under Pennsylvania Law.

 On October 27, 2009, SmithKline Beecham Corporation "domesticated itself under the

laws of another jurisdiction" as allowed by Pennsylvania law. *See* 15 Pa. Cons. Stat. § 1980. In

accordance with that law, SmithKline Beecham Corporation surrendered its corporate charter

under the laws of Pennsylvania by filing modified articles of dissolution with the Pennsylvania

Department of State. As explained in the official commentary to Section 1980, this filing did not

cause an actual dissolution, but rather simply confirmed the change in status:

> This section [1980] is intended to provide a procedure under which
> a domestic business corporation that has domesticated itself under
> the laws of another jurisdiction can clarify its status in
> Pennsylvania. . . . *The effect of filing under this section is not to*

32

> *dissolve the corporation in the ordinary sense* but simply to terminate its status as a domestic business corporation. The existence of the corporation is not affected because the same entity continues to exist in the new jurisdiction of incorporation.

15 Pa. Cons. Stat. § 1980 cmt (West 2010) (emphasis added). SmithKline Beecham Corporation's articles of dissolution noted, "SmithKline Beecham Corporation is being domesticated to Delaware and subsequently converted to a Delaware Limited Liability Company under Delaware and Pennsylvania law." (*See* Excerpt from Articles of Dissolution (Ex. L).) The certificate of formation of GSK LLC also indicated that GSK LLC "shall be a continuation of SmithKline Beecham Corporation." (Heslop Decl. at ¶ 9.) As this Court recognized, "SKB did not dissolve when it was converted to LLC." *Brewer*, 2011 U.S. Dist. LEXIS 31149, at *9; *see also White*, 2010 U.S. Dist. LEXIS 79520, at *13 ("[A]t no point in the process did [GSK LLC] terminate its existence as a corporate entity."); *Hoch*, 736 F. Supp. 2d at 222 (same).

　　This is distinguishable in material ways from the situation where a corporation *actually dissolves*. In an actual dissolution, a corporation ceases to exist, and its assets are distributed to the shareholders. Under the procedure SmithKline Beecham followed, however, it was only required to disclose its name and address (and those of its directors and officers), its date of incorporation, the statute under which it was incorporated, and a statement that its shareholders had approved the filing. *See* 15 Pa. Cons. Stat. § 1977(b)(l)-(4). But because SmithKline Beecham did not dissolve, it was not required to distribute its assets to its shareholders, make provisions for its liabilities, or wind-up its affairs, and so it was not required to make such statements in its modified articles of dissolution. *See* 15 Pa. Cons. Stat. § 1977(b)(5)(8). *White*, 2010 U.S. Dist. LEXIS 79520, at *12 ("When a corporation 'dissolves' by domestication under §1980, the corporation still exists as a corporation under the laws of another state.")

33

### 2. Plaintiffs' Interpretation Is Inconsistent with the Purpose of the Pennsylvania Survival Statute.

Plaintiffs rely on the Southern District of Illinois's interpretation of the modified articles of dissolution to argue that SmithKline Beecham can be sued under Pennsylvania's survival statute – which is applicable only to corporations that no longer exist. Such an interpretation of the survival statute is inconsistent with its purpose. When a corporation dissolves, it distributes all of its assets to its shareholders and ceases to exist. Without a survival statute, a corporation could dissolve and distribute its assets to its shareholders to avoid its debts. Creditors of the dissolved corporation would have no way to recover.

When a corporation domesticates itself to another state, as SmithKline Beecham did, the corporation continues to exist under the laws of the other state. *See* 8 Del. Code § 265(g). Its liabilities and debts are preserved against the entity in the new state. *See* 8 Del. Code § 265(f) (When a non-Delaware entity converts into a Delaware corporation, "all debts, liabilities and duties of the other entity that has converted shall remain attached to the [Delaware corporation] to which such other entity has converted . . . and may be enforced against it to the same extent as if said debts, liabilities and duties had originally been incurred or contracted by it in its capacity as a [Delaware Corporation].") A survival statute, therefore, is "not necessary to preserve such remedies, rights or claims," where, as here, the corporation still exists under the laws of another state. *White*, 2010 U.S. Dist. LEXIS 79520, at *12.

The Southern District of Illinois cases that Plaintiffs cite misapply Pennsylvania's survival statute. The cases on which that court relied do not suggest that a corporation should be subject to the survival statute when it merely domesticates to another state. Instead, the cases illustrate the strict procedure in place for corporations to dissolve and cease to exist. *See F.P. Woll & Co. v. Fifth & Mitchell St. Corp.*, No. 96-CV-5973, 2001 U.S. Dist. LEXIS 24050, at *7 (E.D.

34

Pa. Dec. 13, 2001) ("Pennsylvania has a *detailed statutory scheme* for voluntary corporate

dissolution.") (internal citations omitted and emphasis added). The Southern District of Illinois

overlooked this detailed statutory scheme and, instead, focused only on four of the eight

requirements for actual corporate dissolution under 15 Pa. Cons. Stat. § 1977(b). *See White*, 2010

U.S. Dist LEXIS 79520, at *11, n.3.

The purpose of the survival statute is "to set up an orderly procedure for the dissolution of a

business corporation and at the same time to fix a time beyond which the shareholders need no

longer concern themselves about the possibility that creditors might assert claims which could upset

the dissolution and resurrect the corporation for the purpose of defending against the alleged

claims." *See Am. Optical Co. v. Philadelphia Elec. Co.*, 228 F. Supp. 293, 295 (E.D. Pa. 1964).

When a corporation does not actually dissolve, there is no question of resurrection because it

continues to exist in another form. Plaintiffs' interpretation of the statute ignores its very purpose

and intent. As the successor entity, GSK LLC succeeded to the liabilities of SmithKline Beecham,

thus GSK LLC — not SmithKline Beecham — is the entity subject to suit.

**D.     This Court Should Certify the Issue for Interlocutory Appeal.**

The Brewer decision was not capable of appellate review. Under Section 1292(b), a

district judge may certify an order for review if the judge believes that the order "involves a

controlling question of law as to which there is substantial ground for difference of opinion and

that an immediate appeal from the order may materially advance the ultimate termination of the

litigation." GSK submits that this Court should deny remand here, but also certify its decision

for review to the U.S. Court of Appeals for the Third Circuit.

*Brewer* cannot be reconciled with controlling precedent from the Supreme Court and the

Third Circuit, and the *Brewer* decision creates a split in authority in this District. Absent

appellate review, this precise issue – the citizenship of GSK LLC – could continue to be litigated

35

in countless remand motions in subsequent cases that will be removed to this District. Early

review of this question by the Third Circuit could save tremendous resources for both the courts

of this District and the litigants by settling the question – whatever the outcome – without further

remand litigation.

### IV.    CONCLUSION

For the foregoing reasons GSK LLC respectfully requests that this Court hear oral

argument on Plaintiffs' Motions to Remand in the above consolidated case, deny that Motion,

and certify the issue for interlocutory appeal.

Dated: May 27, 2011

Respectfully submitted,

LAVIN O'NEIL RICCI CEDRONE & DISIPIO

By:___*/s/ Joseph E. O'Neil*_____
     Joseph E. O'Neil, Esquire (ID No. 29053)
     Carolyn L. McCormack, Esquire (ID No.
     87800)
     Suite 500
     190 North Independence Mall West
     6th & Race Street
     Philadelphia, PA  19106
     (215) 627-0303
     (215) 627-2551 (facsimile)

     Attorneys for Defendant GlaxoSmithKline
     LLC, formerly SmithKline Beecham
     Corporation d/b/a GlaxoSmithKline

## CERTIFICATE OF SERVICE

I hereby certify that I have on this day served a copy of the foregoing OPPOSITION TO

PLAINTIFFS' MOTION TO REMAND by depositing a copy of the same in the U.S. Mail, first-

class, postage prepaid, and addressed as follows:

> Feldman & Pinto
> Rosemary Pinto, Esquire
> 1604 Locust Street, 2R
> Philadelphia, PA 19103

> Motley Rice LLC
> Fred Thompson, III, Esquire
> Kimberly D. Barone Baden, Esquire
> Adrian W. Broome, Esquire
> 28 Bridgeside Boulevard
> Mount Pleasant, SC 29464

> **Counsel for Plaintiffs**

> This 27th day of May, 2011.

<em>/s/ Joseph E. O'Neil</em><br>Joseph E. O'Neil

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **ISAIAS COLON MALDONADO, a Minor, by Frances Maldonado and Wilmaris Colon Montes, as Parents and Natural Guardians,**<br><br>vs.<br><br>**SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : : : : : : : : : : : : | **Civil Action No.: 11-2812** |
| **JASMINE CALDWELL, a Minor, by Denine Caldwell and Jason Caldwell, as Parents and Natural Guardians,**<br><br>vs.<br><br>**SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : : : : : : : : : : | **Civil Action No.: 11-2813** |
| **JESSE DEWITT, a Minor, by Summer Jenkins, as Parent and Natural Guardian,**<br><br>vs.<br><br>**SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : : : : : : : : : : : | **Civil Action No.: 11-2814** |
| **ELIZABETH SEDLACEK, a Minor, by Robin Lucas, as Parent and Natural Guardian,**<br><br>vs.<br><br>**SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : : : : : : : : : : : : | **Civil Action No.: 11-2815** |

| | | |
|---|---|---|
| **CHARLES STOKES, a Minor, by Wendy Springer, as Parent and Natural Guardian,** | : | |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : | **Civil Action No.: 11-2816** |
| | : | |
| | : | |
| | : | |
| **VICTORIA CHANDLER, a Minor, by Julie L. Hill, as Parent and Natural Guardian,** | : | |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : | **Civil Action No.: 11-2817** |
| | : | |
| | : | |
| | : | |
| **JACOB VOORHEES, a Minor, by Tiffany Voorhees and Scott Voorhees, as Parents and Natural Guardians,** | : | |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : | **Civil Action No.: 11-2818** |
| | : | |
| | : | |
| | : | |
| **PATRICK WELSH, a Minor, by Barbara Welsh, as Parent and Natural Guardian,** | : | |
| | : | |
| | : | |
| **vs.** | : | |
| | : | |
| **SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : | **Civil Action No.: 11-2819** |
| | : | |
| | : | |

| | | |
|---|---|---|
| MASON JASON YUEILL, a Minor, by Michael J. Yueill, et al., | : | |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE | : | **Civil Action No.: 11-2820** |
| | : | |
| | : | |
| | : | |
| MARION HOPE CHANDLER, a Minor, by Julie L. Hill, as Parent and Natural Guardian, | : | |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE | : | **Civil Action No.: 11-2821** |
| | : | |
| | : | |
| NAOMI CHANDLER, a Minor, by Trenice Chandler, et al., | : | |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE | : | **Civil Action No.: 11-2822** |
| | : | |
| | : | |
| | : | |
| SAMUEL NOAH ELLISON, a Minor, by Julia Ann Ellison, as Parent and Natural Guardian, | : | |
| | : | |
| | : | |
| vs. | : | |
| | : | |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE | : | **Civil Action No.: 11-2823** |
| | : | |
| | : | |

| | |
|---|---|
| **KYLA HODNETT, a Minor, by Eve** : | |
| **Hodnett, as Parent and Natural Guardian,** : | |
| : | |
| **vs.** : | |
| : | |
| : | |
| **SMITHKLINE BEECHAM** : | |
| **CORPORATION d/b/a** : | **Civil Action No.: 11-2824** |
| **GLAXOSMITHKLINE** : | |
| : | |
| : | |
| : | |
| **ROSS ANGELY PORTALATIN-** : | |
| **MENDEZ, a Minor, by Carmen M.** : | |
| **Mendez-Maldonado and Juan Portalatin,** : | |
| **as Parents and Natural Guardians,** : | |
| : | |
| **vs.** : | |
| : | |
| : | **Civil Action No.: 11-2825** |
| **SMITHKLINE BEECHAM** : | |
| **CORPORATION d/b/a** : | |
| **GLAXOSMITHKLINE** : | |
| : | |
| | |
| **SARAH WATTS, a Minor, by Lester** : | |
| **Watts and Tammy Watts, as Parents and** : | |
| **Natural Guardians,** : | |
| : | |
| **vs.** : | |
| : | |
| **SMITHKLINE BEECHAM** : | |
| **CORPORATION d/b/a** : | **Civil Action No.: 11-2826** |
| **GLAXOSMITHKLINE** : | |
| : | |
| : | |
| | |
| **ALLISON KEEFE, a Minor, by Cynthia** : | |
| **Keefe and Stanley A. Keefe, as Parents** : | |
| **and Natural Guardians,** : | |
| : | |
| **vs.** : | |
| : | |
| **SMITHKLINE BEECHAM** : | |
| **CORPORATION d/b/a** : | **Civil Action No.: 11-2827** |
| **GLAXOSMITHKLINE** : | |
| : | |
| : | |

| | | |
|---|---|---|
| **JENNIFER SCHAFFTER, a Minor, by Debra Petty, as Parent and Natural Guardian,**<br><br>vs.<br><br>**SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : : : : : : : : : : : : | **Civil Action No.: 11-2828** |
| **BROOKE BABICH, a Minor, by Bruce Babich, as Parent and Natural Guardian,**<br><br>vs.<br><br>**SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : : : : : : : : : : : : | **Civil Action No.: 11-2829** |
| **ARIANNA SMART, a Minor, by Angela Smart, et al.,**<br><br>vs.<br><br>**SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : : : : : : : : : : : : | **Civil Action No.: 11-2830** |
| **MASON ANDREW STEINBECK, a Minor, by Mikelann Steinbeck, as Parent and Natural Guardian,**<br><br>vs.<br><br>**SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE** | : : : : : : : : : : : : | **Civil Action No.: 11-2831** |

| | |
|---|---|
| TANNER A. WIELAND, a Minor, by Christina Wieland, et al. | : |
| | : |
| | : |
| vs. | : |
| | : |
| SMITHKLINE BEECHAM CORPORATION d/b/a GLAXOSMITHKLINE | : Civil Action No.: 11-2832 |
| | : |
| | : |
| | : |

## ORDER

AND NOW, this _____ day of _____, 2011, it is hereby **ORDERED** that

Plaintiffs' Motion to Remand is **DENIED**.

_____

Savage, J.

# Exhibit E

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| VALERIE HERMAN, | : | |
| | : | CIVIL ACTION |
| Plaintiff, | : | |
| | : | NO. 11-5968 |
| v. | : | |
| | : | |
| SMITHKLINE BEECHAM | : | |
| CORPORATION, | : | |
| | : | |
| Defendant. | : | |

**ORDER**

**AND NOW,** this 27th day of September 2011, upon consideration of Plaintiff's Motion

to Remand (Doc. No. 3), it is **ORDERED** that the Motion to Remand (Doc. No. 3) is

**GRANTED,** and the above-captioned case is **REMANDED**[1] to the Court of Common Pleas of

Philadelphia County, Pennsylvania. The Clerk of Court shall close this case for statistical

purposes.

BY THE COURT:

/s/ Joel H. Slomsky, J.
JOEL H. SLOMSKY, J.

---

[1] On September 21, 2011, Defendant Smithkline Beecham Corporation removed this
action to this Court from the Court of Common Pleas of Philadelphia County, Pennsylvania.
(Doc. No. 1). On September 26, 2011, Plaintiff filed a Motion to Remand.

Under 28 U.S.C. § 1441(b), an action is not removable when any defendant is a citizen of
the state in which the action was brought. Here, in accordance with Brewer, et al. v. Smithkline
Beecham Corp., Defendant Smithkline Beecham Corporation's "nerve center" is located in
Pennsylvania, and therefore Defendant is a citizen of Pennsylvania. No. 10-4443, 2011 WL
1103627 (E.D. Pa. Mar. 24, 2011). Consequently, this case is not removable and the Court will
remand the case to the Court of Common Pleas of Philadelphia County, Pennsylvania.

If Defendant Smithkline continues to file these removal petitions in cases involving Paxil,
the Court will consider in the future requiring payment of just costs and actual expenses,
including attorney fees incurred as a result of the filings pursuant to 28 U.S.C. § 1447(c).